798 A.2d 148 (2002)
351 N.J. Super. 308
D.D., Petitioner-Appellant,
v.
NEW JERSEY DIVISION OF DEVELOPMENTAL DISABILITIES, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 2002.
Decided May 31, 2002.
S. Paul Prior argued the cause for appellant (N.J. Protection and Advocacy, Inc., attorney; Mr. Prior, on the briefs). *149 Robert Bates, Deputy Attorney General, argued the cause for respondent (David Samson, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Mr. Bates, on the brief).
Before Judges CONLEY, A.A. RODRIGUEZ and LEFELT.
The opinion of the court was delivered by RODRIGUEZ, A.A., J.A.D.
In this appeal, we are called upon to analyze the definition of "developmental disability" set forth in N.J.S.A. 30:6D-25b. D.D., a fifty-four year old mentally impaired man, sought services from the Division of Developmental Disabilities (Division) asserting that he suffered from a "developmental disability" as defined by N.J.S.A. 30:6D 25b. The Division denied his application. D.D. challenged the denial. The matter was transferred to the Office of Administrative Law as a contested case. Following a hearing, the Administrative Law Judge (ALJ) determined that D.D. was not eligible for the Division's services. The Division's Director adopted the ALJ's findings and conclusions. This constituted a final agency decision from which D.D. appeals. We reverse. We hold that the Director applied an incorrect standard in determining whether D.D. suffered from a developmental disability.
The facts may be summarized as follows. At birth, D.D. emerged from a breech delivery with his head flattened in the right occipital area. Subsequently, he developed prognathous (jaws that project forward to a marked degree) and altered dentition. He did not learn to walk or talk until he was two years old. He was not toilet trained until he was five or six years old. During childhood, D.D. suffered from impaired gross and fine motor coordination. He could not catch objects thrown to him and he had difficulty with his gait and balance. Because he failed the first grade, he was placed in a special education class.
When D.D. was thirteen years old, Martin Silbersweig, M.D., an internist, diagnosed him as mentally retarded. When D.D. was seventeen years old, Alvin L. Robins, M.D., a neurologist, noted that:
[D.D.] has diffuse cerebral dysfunction of a neonatal or perhaps antenatal etiology. This is manifested by mental retardation, by several skeletal dysplastic features, and more recently, a schizophrenic-like picture with alterations in affect, motor activity, and with hallucinosis.
Dr. Robins also described D.D. as having "profound neural abnormalities since neonatal life," and characterized his intellectual ability as "quite depressed."
D.D. left his special education school when he was nineteen. A close friend of D.D.'s father gave D.D. a job in a factory. D.D. remained at the factory for ten years until it closed down. Subsequently, D.D. worked at two other short term jobs arranged through the Association for Retarded Citizens (ARC). D.D. was unsuccessful in keeping these position due in part to his inability to perform basic job functions.
At age thirty-two, D.D. applied for Social Security Benefits. The benefits examiner, Daniel Wolkstein, PhD., determined that D.D. was functioning within the range of mild mental retardation with an Intelligence Quotient (I.Q.) of seventy-four.
At age fifty, D.D. applied to the Division for services. Richard J. Waldron, Ph.D, a psychologist, assessed D.D. and determined that his I.Q. was sixty-seven. Based on this assessment, Dr. Waldron opined that D.D. probably suffered from neurological involvement, that "[a]s his conditions worsen, it appears that his disabling *150 conditions are permanent and unlikely to improve." Dr. Waldron's diagnoses were: Adjustment Disorder with Mixed Anxiety and Depressed Mood, Expressive Language Disorder, Mild Mental Retardation (primary disability) and Mild Cortical atrophy.
The Division denied D.D.'s application because there was no evidence of a developmental disability. An informal conference among D.D., members of his family, and representatives of the Division was unproductive. Consequently, the Division informed D.D. that he remained ineligible for services.
Three witnesses testified at the hearing conducted by the ALJ. Shashi Jain, PhD., a principal clinical psychologist with the Division, testified. She reviewed D.D.'s medical history and interviewed him. Dr. Jain opined that D.D.'s "cognitive adaptive behavior is at least in the Borderline Range as indicated by his previous psychological test results." Dr. Jain explained that a person must have an I.Q. score below seventy in order to qualify for services. This standard is mandated by N.J.A.C. 10:46-2.1(e). According to Dr. Jain, D.D. is not eligible for the Division's services because his I.Q. was not within this range.
Julie Drillings, an intake worker for the Division, testified. She was a member of the Interdisciplinary Team that assessed D.D.'s eligibility for services. The team is composed of an intake worker, a psychologist, a supervisor from the county in which the applicant resides and any other individuals who may be recommended for the team. The team determined that D.D. had "borderline intelligence" and was not mildly mentally retarded according to the Division's regulations. She administered a critical adaptive behavior inventory assessment to D.D. Based on the results of the assessment, she determined that D.D. "had substantial functional limitations in three out of [six] areas of major life activity." These areas included: (1) receptive and expressive language; (2) learning; and (3) self direction. Although D.D. was not eligible for the Division's services, she believed that other agencies may be able to assist D.D.
Corinne Stella Frantz, Ph.D., a clinical psychologist and neuropsychologist, testified on behalf of D.D. She administered numerous psychological examinations to D.D. Although D.D. scored a seventy four on the I.Q. test, Dr. Frantz opined that he should be diagnosed as having mild mental retardation instead of borderline intelligence. Dr. Frantz based her opinion on a psychological concept known as a confidence interval. This interval can alter an individual's I.Q. score by five points in either direction, depending on a number of variables present on a given day. Because this interval extends the range for mild mental retardation between sixty-nine and seventy-nine, D.D.'s I.Q. scores classify him in the mild mental retardation range. In her report, Dr. Frantz's concludes:
[D.D.] suffers from a developmental disability dating back prior to the age of 21 and characterized by a pervasive, severe and chronic cognitive disability which is most appropriately diagnosed as mild mental retardation and which has resulted in substantial functional limitations in 4 out of 6 areas of major life activity. These areas include: receptive/expressive language, learning, self-direction, and capacity for independent living and economic self-sufficiency. [D.D.]'s condition is most likely to continue indefinitely for the rest of his life.
Diagnostic Impression:
Mental Retardation, Mild.
Diffuse, severe cerebral dysfunction, chronic. Dystonia
*151 On cross-examination, Dr. Frantz admitted she was not familiar with the Division's regulations.
The ALJ also considered a certification by D.D.'s mother, who is eighty-three years old. According to her, D.D. is not able to vacuum, cook, or do laundry independently. D.D. must also be reminded to brush his teeth. D.D. cannot budget his own money, pay his own bills, or deposit his own Social Security Disability checks. He cannot count money or change in a meaningful way. He does not know how to shop for groceries. He needs to be monitored when taking his medication. He needs assistance with meal preparations.
The ALJ found that D.D. was not eligible for services because he was not developmentally disabled. The ALJ noted that a developmental disability is defined by N.J.S.A. 30:6D-25b as:
a severe, chronic disability of a person which: (1) is attributable to a mental or physical impairment or combination of mental or physical impairments; (2) is manifest before age 22; (3) is likely to continue indefinitely; (4) results in substantial functional limitations in three or more of the following areas of major life activity, that is, self care, receptive and expressive language, learning, mobility, self-direction and capacity for independent living or economic self-sufficiency; and (5) reflects the need for a combination and sequence of special interdisciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated.
The ALJ found that D.D. suffered from a "severe and chronic" disability which he characterized as follows:
[s]imply put, the uncontroverted functional limitations which D.D. suffers from are harsh, unsparing, grave, extreme, acute and unyielding. This is what severe means in the context of this case (see Webster's New World Dictionary of the American Language, College Edition, 1957). Moreover, those same limitations have been long-lasting, constant and always present from D.D.'s childhood through today. As such, they meet the dictionary definition for being chronic (see Webster's. Id and the Encarta World English Dictionary, St. Martin's Press, 1999).
The ALJ found that D.D.'s proofs had established all of the eligibility requirements set forth in N.J.S.A. 30:6D-25b, except for one. (that the disability is attributable to a mental impairment).
The ALJ found insufficient evidence to establish that D.D. suffered from any physical-motor or neurological impairment. The ALJ rejected most of Dr. Frantz's expert testimony regarding the source of D.D.'s disability. The ALJ found:
the undersigned has not been convinced that on the basis of credible, legally competent and medically probable evidence, D.D.'s diability stems from a neurological injury or condition which occurred neonatally. Although Dr. Frantz indicated that D.D. had diffuse cerebral dysfunction early on and that it was likely D.D.'s cortical dendritic synapses were destroyed, she was not qualified to testify as a neurologist or to render strictly neurological opinions. As a result, her medically uncorroborated opinion as to the existence of a nonspecific neurological impairment are entitled to little weight. Suffice it to say that on the basis of all the evidence presented by petitioner, the undersigned is UNABLE TO CONCLUDE that petitioner has (or had) a neurological impairment which eventuated in his present disability.
*152 The ALJ concluded that "D.D.'s mild mental retardation [is] the sole possible basis for eligibility." However, because D.D.'s I.Q. is greater than seventy, the ALJ found that D.D. did not meet the criteria defining mental retardation as established by N.J.A.C. 10:46-2.1(e).
The Director adopted the findings and conclusions of the ALJ. The Director's decision focused primarily on the finding that D.D.'s I.Q. exceeded seventy points, the ceiling set by N.J.A.C. 10:46-2.1(e). The Director also rejected Dr. Frantz's opinion about the "confidence interval."
D.D. now appeals, contending that the Division applied an incorrect legal standard in determining whether he suffered from a developmental disability. We agree with the contention. Accordingly, we remand for a new hearing. We, therefore, do not reach the merits of the second contention, i.e., that the uncontroverted evidence clearly establishes his eligibility for the Division's services.
A step-by-step analysis is required. In order to be eligible for services from the Division, a person's condition must meet the definition for "developmental disability" and the person must be declared eligible by the Division. N.J.S.A. 30:6D-25e.[1] A developmental disability must be "severe" and "chronic" and meet five additional requirements. N.J.S.A. 30:6D-25b. The ALJ found, and the Director accepted, that D.D. had established all requirements, except the first, i.e., that the disability was attributable to a mental impairment. The Division appears to interpret the statute as requiring proof of a neurological injury or mental retardation in order to meet the "mental impairment" requirement.
From our review of the record, we conclude that the Division was too cramped in its view of what constitutes a mental impairment. N.J.S.A. 30:6D-25(b)(1) requires that a developmental disability be "attributable to a mental or physical impairment or combination of mental or physical impairments." The term "mental impairment" is not defined by the statute. However, it is defined by regulation as: an "impairment in cognitive, neurological, sensory, cerebral or motor functioning resulting from other than mental illness." N.J.A.C. 10:46-1.3. This is an expansive definition. It focuses on the impact of the condition upon the person. Other than excluding "mental illness," the definition does not require the identification of a specific mental or physical injury so long as the person's functioning is impaired. In short, D.D. does not have the burden of proving a definitive cause or source of the mental impairment.
Here, the ALJ did not accord much weight to Dr. Frantz's opinion that D.D. had suffered a neo-natal neurological injury. That determination was clearly within the ALJ's province. We have no warrant to interfere with it. See State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999). However, the failure to identify a neurological injury as a cause of disability does not translate into a finding that D.D.'s *153 disability was not "attributable to a mental impairment."
The ALJ had already found that D.D. suffered a "severe and chronic" disability. It was uncontroverted that this disability was not caused by a physical impairment or mental illness. According to the ALJ, the disability was not caused by a neurological injury. Nevertheless, the disability existed. It is inferable from the evidence that it impaired D.D.'s cognitive and/or cerebral functioning. The ALJ, however, did not consider this possibility. He concluded instead that, absent proof of a neurological injury, D.D. could only be eligible for services if his severe disability was caused by mental retardation as defined by N.J.A.C. 10:46-2.1(e). This constricted view is contrary to the statutory definition.
Mental retardation is one of several examples given in the statute as an illustration of "developmental disability."[2] The operative definition, however, is broader than all of the examples contained in N.J.S.A. 30:6D-25b. Thus, the finding that D.D. is not mentally retarded within the meaning of N.J.A.C. 10:46-2.1(e), is not conclusive. If D.D.'s condition meets the requirements of a developmental disability, D.D. is eligible for services.
We are mindful that an appellate court respects an agency's expertise in interpreting its regulations. However, the ultimate interpretation of statutes is a judicial, not administrative function, and the court is in no way bound by the agency's interpretation. Mayflower Secs. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973). Moreover, here, the regulations adopted by the Division provide a definition for "impairment" which is broader than the Division's interpretation of the regulation.
Accordingly, we reverse the Division's decision and remand for a new determination applying the definition for developmental disability set forth in N.J.S.A. 30:6D-25b.
NOTES
[1] These services include

specialized services or specialized adaptations of generic services provided by a public or private agency, organization or institution and directed toward the alleviation of a developmental disability or toward the social, personal, physical or economic habilitation or rehabilitation of a person with a developmental disability and includes care management, diagnosis, evaluation, treatment, personal care, day care, domiciliary care, special living arrangements, training, education, vocational training, recreation, counseling of the person with the disability and his [or her] family, information and referral services and transportation services.
[N.J.S.A. 30:6D-25f]
[2] N.J.S.A. 30:6D-25b provides in part:

Development disability includes, but is not limited to, severe disabilities attributable to mental retardation, autism, cerebral palsy, epilepsy, spina bifida and other neurological impairments where the above criteria are met. (emphasis added).