886 A.2d 194 (2005)
381 N.J. Super. 366
T.H., Petitioner-Appellant,
v.
DIVISION OF DEVELOPMENTAL DISABILITIES, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted April 12, 2005.
Decided November 29, 2005.
*196 Hinkle & Fingles, attorneys for appellant (S. Paul Prior, Lawrenceville, on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Robert Bates, Deputy Attorney General, on the brief).
Before Judges STERN, COBURN and WECKER.
The opinion of the court was delivered by
WECKER, J.A.D.
Petitioner, T.H., is an adult who has been diagnosed with Asperger's Syndrome, a neurological disorder that shares some of the characteristics associated with autism.[1] T.H. appeals from a final agency decision of the Director of the Division of Developmental Disabilities denying his application for services as a developmentally disabled individual pursuant to the Developmentally Disabled Rights Act, N.J.S.A. 30:6D-1 to -12. See N.J.S.A. 30:6D-3a.[2]
We have thoroughly reviewed the record and the briefs in light of the contentions of the parties, with particular attention to petitioner's contention that the regulation adopted by the Division and applied to his application is inconsistent with the statute under which the Division derives its authority. After full consideration of the arguments, we are convinced that the regulation is consistent with the underlying statute and therefore is valid and enforceable. In addition, we are satisfied that there is sufficient credible evidence to support the administrative law judge's initial decision, which was adopted by the Director. We therefore affirm the agency decision denying developmental disability services to T.H.
This is unquestionably a tragic case. T.H., a man born in 1949, lived with and was cared for by his parents until they died within eight months of each other when T.H. was fifty years old. The parties stipulated that T.H. has Asperger's Syndrome, and agreed that petitioner actually had the condition as a child, although the medical community had not identified and named the syndrome as such until well after T.H. reached adulthood. *197 On the day of his mother's death in July 2000, while his siblings were making funeral arrangements, T.H. attempted suicide by carbon monoxide poisoning, along with an overdose of an anti-depression medication. While he survived the attempt, he was left with a traumatic brain injury, causing short-term memory loss and severe physical limitations; the latter require him to ambulate primarily with a wheelchair. He is unquestionably unable to function on his own at this time. His condition also has made it impossible for any of his siblings to care for him.
T.H.'s appeal from the Division's initial denial of services led to a contested hearing in the Office of Administrative Law. Three witnesses testified at that hearing. The judge qualified Dr. Arthur Bernstein, a full-time senior clinical psychologist with the Division, as an expert in both "clinical psychology" and "the issues regarding eligibility requirements for [Division] purposes." Dr. Bernstein testified on behalf of the Division. Dr. Linda Petti, who was also qualified as an expert in clinical psychology, testified on behalf of T.H. The only fact witness was T.H.'s older sister, J.S.
The administrative law judge found that "T.H. has failed to demonstrate how he is eligible to receive [developmental disability] services, given the criteria to obtain such services." The issue as defined by the judge was whether the functional limitations defined by N.J.S.A. 30:6D-3a(4), and required in order to qualify for assistance from the Division, were "manifest" before T.H. reached the age of twenty-two, as required by N.J.A.C. 10:46-1.3.
On appeal, T.H. presents these arguments:
POINT I
THE A.L.J. RECOMMENDED, AND THE DIVISION OF DEVELOPMENTAL DISABILITIES APPLIED, THE INCORRECT LEGAL STANDARD WHEN MAKING ITS FINAL ADMINISTRATIVE AGENCY DECISION.
POINT II
THE DIVISION OF DEVELOPMENTAL DISABILITIES' REGULATION, N.J.A.C. 10:46-1.3, CONFLICTS WITH N.J.S.A. 30:6D-3, RENDERING THE AGENCY'S REGULATION INVALID.
POINT III
[T.H.] IS ELIGIBLE FOR SERVICES FROM THE DIVISION OF DEVELOPMENTAL DISABILITIES PURSUANT TO N.J.S.A. 30:6D-3.
In sum, T.H. contends that under the law, it is sufficient that his underlying condition was "manifest" before age twenty-two, even if all of his functional limitations were not.
The first issue before us is whether the agency evaluated petitioner under the correct definition of developmental disability. The statute, N.J.S.A. 30:6D-3a, provides:
"Developmental disability" means a severe, chronic disability of a person which:
(1) is attributable to a mental or physical impairment or combination of mental or physical impairments;
(2) is manifest before age 22;

(3) is likely to continue indefinitely;
(4) results in substantial functional limitations in three or more of the following areas of major life activity, that is, self-care, receptive and expressive language, learning, mobility, self-direction and capacity for independent living or economic self-sufficiency;[[3]] and

*198 (5) reflects the need for a combination and sequence of special inter-disciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated. Developmental disability includes but is not limited to severe disabilities attributable to mental retardation, autism, cerebral palsy, epilepsy, spina bifida and other neurological impairments where the above criteria are met.
The regulation, N.J.A.C. 10:46-1.3, includes an almost identical definition of "developmental disability," with one critical addition:
"Developmental disability" means a severe chronic disability of a person which:
1. Is attributable to a mental or physical impairment or combination of mental or physical impairments;
2. Is manifest before age 22;
3. Is likely to continue indefinitely;
4. Results in substantial functional limitations before the age of 22 in three or more of the following areas of major life actively [sic], that is self-care, receptive and expressive language, learning, mobility, self-direction and capacity for independent living or economic self sufficiency; and
5. Reflects the need for a combination and sequence of special interdisciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated.
6. Developmental disability includes, but is not limited to, severe disabilities attributable to mental retardation, autism, cerebral palsy, epilepsy, spina bifida and other neurological impairment where the above criteria are met.
[Emphasis added].
The regulation provides, as the fourth element of the definition, not only that the condition "results in substantial functional limitations," but that it did so "before the age of 22."
The scope of our review of an agency decision, whether viewed as an adjudicative action or the interpretation and application of a statute, is limited. There is a presumption of validity to be accorded to the agency's decision, which will be sustained unless it is "arbitrary, capricious, or unreasonable [or] ... clearly inconsistent with its statutory mission or with other state policy." Brady v. Bd. of Review, 152 N.J. 197, 210, 704 A.2d 547 (1997). See also Matturri v. Bd. of Trs. of the Judicial Ret. Sys., 173 N.J. 368, 382-83, 802 A.2d 496 (2002); see generally, Pressler, Current N.J. Court Rules, Comments 7.2, 7.3, and 8.1 on R. 2:10-2 (2006).
The judicial role [in reviewing regulations] is restricted to three inquiries: (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
[In re Petitions for Rulemaking, N.J.A.C. 10:82-1.2 and 10:85-4.1, 117 N.J. 311, 325, 566 A.2d 1154 (1989) (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963))].
*199 An agency's interpretation of a statute is entitled to deference where agency expertise forms the basis for that interpretation, see D.D. v. New Jersey Div. of Developmental Disabilities, 351 N.J.Super. 308, 317, 798 A.2d 148 (App.Div.2002), but no such deference is warranted or appropriate where the agency has exceeded the scope or authority of the enabling legislation. An administrative agency cannot, under the guise of administrative interpretation, give a statute any greater effect than is permitted by the statutory language. In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 450, 608 A.2d 288 (1992). "It is ... a basic principle that the agency's power exists solely as granted by the Legislature." DiVigenze v. Chrysler Corp., 345 N.J.Super. 314, 327, 785 A.2d 37 (App.Div.2001), certif. denied, 171 N.J. 442, 794 A.2d 181 (2002). Thus a regulation can only be set aside if it is arbitrary or capricious, plainly transgresses the statute it purports to effectuate, or alters the terms of the statute and frustrates the policy embodied in it. New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 82, 411 A.2d 168 (1980). The burden is on the party challenging the validity of the regulation. New Jersey State League of Municipalities v. Dep't of Community Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999).
A detailed review of the legislation providing services for individuals with a developmental disability is essential to our analysis of the challenged regulation. The Developmentally Disabled Rights Act, N.J.S.A. 30:6D-1 to -12, L. 1977, c. 82, was enacted largely to conform to federal law. See Statements of Senate Institutions, Health and Welfare Comm. (May 17, 1976) and Assemb. Institutions, Health and Welfare Comm. (July 30, 1976) to S. 1384, citing "The Developmentally Disabled Assistance and Bill of Rights Act" [P.L. 94-103, 42 U.S.C.A. 6010].[4] In 1985, the Division of Developmental Disabilities Act, N.J.S.A. 30:6D-23 to -30 (L. 1985, c. 145), transferred the powers and duties of the former Division of Mental Retardation to the Division of Developmental Disabilities, still in the Department of Human Services. N.J.S.A. 30:6D-28.
The 1985 legislation includes an identical definition of "developmental disability" to that set forth at N.J.S.A. 30:6D-3a. Compare N.J.S.A. 30:6D-25b. Significantly, however, the 1985 legislation added an explicit delegation of authority to the Director of the Division of Developmental Disabilities:
Within the limits of available funding and services, the director may declare as eligible for services under this act individuals who meet the criteria for developmental disability pursuant to [N.J.S.A. 30:6D-25b] except that their disability was manifested after the age of 22 but before the age of 55. (Emphasis added).
[N.J.S.A. 30:6D-31].[5]
*200 We also note that in 1993, the Legislature enacted the Family Support Act, N.J.S.A. 30:6D-33 to -41, establishing the Family Support System in the Division of Developmental Disabilities. N.J.S.A. 30:6D-36. The legislative findings set forth at N.J.S.A. 30:6D-34 recognize the State's interest in preserving, strengthening and maintaining the family unit, and the rights of "[a]ll individuals, regardless of disability, ... to belong to a family unit where enduring relationships can be fostered."[6]N.J.S.A. 30:6D-34a.376 The definition of "family" under the act is "the family member with a developmental disability and his parents and siblings, or spouse and children." N.J.S.A. 30:6D-35. The record does not disclose any application for services by T.H. or his family while his parents were alive.
In 1995, the Division published its "Proposed Readoption with Amendments: N.J.A.C. 10:46." 27 N.J.R. 2157. The notice provided, in pertinent part:

N.J.A.C. 10:46 is proposed for readoption with minimal changes. Wording has been added to the definition of "developmental disabilities" to clarify that the substantial functional limitation must be present before age 22. The Division has encountered several persons who have applied for services who have a condition diagnosed prior to age 22. The condition does not, however, result in a substantial functional limitation until some time after age 22, often much later in life.
[Emphasis added].
Published comments received by the Division include the following:
COMMENT: The proposed change to the definition of "developmental disability" which indicates that the substantial functional limitation must be manifest *201 prior to age 22, limits the intent of the statute. It should be eliminated.
RESPONSE: The Division, in changing the definition, is seeking to clarify ambiguous language in the statute. The statute clearly states, at N.J.S.A. 30:6D-23, that the disability is "manifest before age 22." It has been argued that the term "manifest" means diagnosed. By such an interpretation, an individual with a condition such as multiple sclerosis may have a diagnosis prior to age 22, but may have no substantial limitations until later adulthood. The Division seeks to clarify its consistent interpretation of the law that the substantial functional limitations themselves must be evident prior to age 22. The Division believes the language to be appropriate.
[27 N.J.R. 3607 (emphasis added)].
The regulation has been readopted repeatedly since 1995 without change to this definition of "developmental disability," to "clarify" that the diagnosis of a condition that can result in functional limitations is not enough to qualify an individual for services. Only the manifestation of the statutorily defined functional limitations trigger eligibility.
We have carefully considered whether, in light of the express delegation of authority enacted in 1985 by N.J.S.A. 30:6D-31, and the legislative intent expressed in the 1993 enactment of the Family Support Act, the regulation adopted in 1995 and invoked by the Division is inconsistent with the definition of a developmental disability. We are satisfied that it is not. By enacting N.J.S.A. 30:6D-31, the Legislature expressed its intention that although persons whose "disability [as evidenced by functional limitations] was manifested after the age of 22 but before the age of 55" can be eligible for services, such services may be provided only "within the limits of available funding."
The best means of administering the statute is not for us to decide, as long as the means adopted are consistent with the intent of the Legislature. It is readily inferable that the additional wording of the regulation adopted in 1995 and repeatedly readopted since then, reflects the Director's determination that the "limits of available funding and services" have not allowed the Division to broaden its potential client base, despite legislative authority to do so.[7]
We therefore do not find the regulation to be inconsistent with the statute in requiring the functional limitations that define a developmental disability, and not merely the diagnosis, to have been manifest  that is, apparent  before the age of twenty-two. The regulation reflects the implicit intent of the statute, that services available for persons with developmental disabilities are intended first for those who have functional limitations in their early years, when they would otherwise be developing the skills of independent living. It also reflects a practical approach to the proof problems inherent in applications for services for persons of more advanced age, such as T.H.[8] Whether this is the best *202 means of administering the statute is not for us to decide, as long as it is consistent with the implied intent of the Legislature. That we might or might not choose the same means of qualifying persons for services is not the test.
Having agreed that the regulation, requiring evidence of defined functional limitations before the age of twenty-two, is valid, the second issue before us is whether the record supports the judge's conclusion that T.H. did not prove such limitations.
The burden of establishing T.H.'s entitlement to services falls upon him, and not the Division.[9] T.H. is the youngest of four siblings, all of whom apparently remember his oddities and limitations as a child, but do not have clinical information about his school or outside evaluations, according to T.H.'s sister, J.S. J.S. is thirteen years older, and was instrumental in assisting with T.H.'s application for assistance. She was the only fact witness on his behalf. Her knowledge of T.H.'s early years was limited, and she had virtually no documentation of his condition. T.H.'s other siblings did not testify.
J.S. described T.H.'s abilities and limitations prior to age twenty-two. As is characteristic of persons with Asperger's Syndrome, he was not intellectually impaired, and was even gifted in certain areas. He had virtually no social interaction with any peers or relations, even while completing high school and a technical drafting course after high school. He made eye contact with no one, and his only employment was initially in his father's business, and then in a business his father sold, allegedly with a condition that T.H. would continue to be employed by the new owner.
According to J.S., T.H.'s only purchases were astronomy equipment and car repairs. He drove only to and from work and to and from a location in the Pine Barrens where he observed the sky. He never took care of his own physical needs; he lived an isolated existence, never having any friends; he did not relate to family members; and he barely spoke with anyone. According to J.S., T.H. had no understanding of money, and could not manage his own financial affairs.
Dr. Petti relied on J.S.'s input, as well as interviews with T.H. and a handful of persons who had some contact with T.H. in his early years. From the limited information available, she offered the opinion that T.H. did suffer functional limitations before the age of twenty-two in at least three of these defined areas: self-direction, self-care, perceptive and expressive language, independent living, and economic self-sufficiency.
Dr. Bernstein agreed that T.H.'s present condition reflects substantial functional limitations in at least three of the areas of major life activity, and that if he were not yet twenty-two, he would qualify for developmental disability services. Dr. Bernstein's responses to several hypotheticals posed in cross-examination are instructive. He agreed that a person who is unable to shop for food and prepare meals for himself, clean his house, do his laundry, and purchase and select his own clothes would have a substantial functional limitation in the area of independent living. He also agreed that a person who is unable to *203 regularly brush his teeth, shower, and attend to his own personal hygiene is substantially limited in the area of self-care, and one who is unable to get a job on his own, and keep it in a competitive market, is limited in the area of economic self-sufficiency. But the only area in which Dr. Bernstein found T.H. to have been substantially limited prior to age twenty-two was "self-direction," based on his inability to enter into "reciprocal social relationships."
The judge rejected the opinion of petitioner's expert, Dr. Petti, and adopted Dr. Bernstein's opinion that T.H. did not manifest the requisite functional limitations before age twenty-two. The administrative law judge stressed that T.H. completed high school as well as post-high school training in draftsmanship, had a driver's license, knew a great deal about astronomy, and actually was employed first in his father's business and then in a successor business for most of his adult years.[10]
The judge noted "the extraordinary potential burdens which face the family" and his sympathy "with their plight." Nonetheless, he concluded:
[T]he most salient factor is the absolute dire paucity of any documentation whatsoever on behalf of T.H. to support any finding that he had a substantial functioning limiting disability prior to the age of 22, notwithstanding, the conceded stipulation that the Asperger's [sic] Disorder was present in him prior thereto. At the same time, the petitioner has failed to produce any medically corroborating documentation to corroborate the causal link or relationship between any such pre-existing Asperger's [sic] Disorder in T.H. which may have substantially functionally limited him prior to that statutorily mandated age of 22.
. . . .
I FIND the testimony of Dr. Arthur Bernstein to be credible, inasmuch as he closely scrutinized the current statutory regulatory requirements and criteria in an effort to analyze the eligibility of T.H. His findings and conclusions appear to be reasonably supported in the record and are consistent with the absence of relevant data regarding T.H. prior to the age of 22. At the same time, I FIND it regrettable that there is such an absence of available information from which to draw any reasonable inference or conclusion, inasmuch as stated hereinabove, I am highly sympathetic with the plight of the family under the circumstances. Yet, I am governed by the strictures of the laws and regulations cited hereinabove which require that there must be a showing of a developmental disability to be manifest and substantially limiting the individual prior to the age of 22. There has been an absolute absence of any such proof offered by the preponderance of the credible evidence presented herein. Thus, I FIND that T.H. is not substantially limited in three out of six areas of life activities, given that restriction. Further, although he has now suffered some significant limitations due to his attempted suicide, the requirement of a long-term set of limitations, as indicated hereinabove, precludes any finding in his favor.
The judge drew certain inferences from the evidence, and found that before age twenty-two, T.H. had only "peculiar quirks and characteristics," but no "substantial functional limitations to any large degree whatsoever." The judge described T.H. as *204 "sheltered and/or cloistered by his parents, [which] does not rise to the level of demonstrating any substantial functional limitation to any appreciable degree." Finally, the judge concluded that "T.H. apparently did what he wanted to do when he wanted to do it and rejected what he did not want to do at other times. Those acts of deliberateness and selectivity do not demonstrate functional limitations either."
There is no dispute that T.H. suffers from "a severe, chronic disability" which, although then unnamed, was "manifest before age 22;" that it is "attributable ... to a combination of mental or physical impairments;" that his condition will "continue indefinitely;" and that he now has "substantial functional limitations in [at least three] areas of major life activity." The question is whether the administrative law judge, and then the Division, arbitrarily found that he did not suffer three areas of substantial functional limitations before age twenty-two.
Our review of the Board's decision is limited to determining whether the factual findings made could reasonably have been reached on credible evidence present in the record, and whether the Board's legal conclusions are consistent with statutory and case law. See, e.g., In re Taylor, 158 N.J. 644, 656-58, 731 A.2d 35 (1999); Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). We must give "due regard" to the ability of the factfinder to judge credibility, especially where the agency's expertise is a factor. Taylor, supra, 158 N.J. at 656, 731 A.2d 35; Kordulak Bros., supra, 44 N.J. at 599, 210 A.2d 753.
We find this to be a close case. What is troubling is that, as is likely typical in many forms of developmental disability, while parents are alive and well and can care for their child, even into adulthood, there may be no need and therefore no application for assistance. But as the disabled adult ages, his or her condition and functioning may well worsen, just as the caretaker parents become disabled themselves or die. This obvious truth supports petitioner's contention, previously recognized by this court, that in adopting the Developmental Disabilities Act, the Legislature intended to broaden and not to narrow the class of eligible persons. See T.L. v. Division of Devel. Disabilities, supra, 243 N.J.Super. at 478, 580 A.2d 272 and n. 2.
While there is credible evidence in support of T.H.'s qualification for services, there is also contrary credible evidence. We cannot say that the judge was arbitrary in finding J.S.'s testimony insufficient to establish T.H.'s substantial functional limitations before age 22, or in accepting Dr. Bernstein's opinion over Dr. Petti's on that issue. Given the limited scope of our review, we are constrained to affirm the Division's decision adopting the findings of the administrative law judge.
Affirmed.
NOTES
[1] Both autism and Asperger's Syndrome, also known as Asperger's Disorder, are described as "pervasive developmental disorders." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) § 299.80 (4th ed.2000). The Division's expert testified that some individuals with that diagnosis have qualified for services.
[2] The record does not reflect whether T.H. has applied for or is receiving other benefits to which he may be entitled, specifically, social security disability benefits. Such financial assistance, however, is not a substitute for the kinds of services the Division can offer. See N.J.S.A. 30:6D-25f.
[3] It is not entirely clear whether the statute intends that "self-direction" and "capacity for independent living" are separate "areas of major life activity." See T.L. v. Div. of Developmental Disabilities, Dep't of Human Servs., 243 N.J.Super. 476, 479 n. 4, 580 A.2d 272 (App.Div.1990). This appeal does not require us to address that question.
[4] Thereafter, based on the Legislature's subsequent finding that "increasing numbers of developmentally disabled persons are being placed into community residences as an alternative to institutional confinement," that "deinstitutionalization is highly desirable," but that "the well-being of developmentally disabled persons living under State sponsorship in the community requires clarification of their rights and the rights of family members [and others]," N.J.S.A. 30:6D-13 to -22 was enacted by L. 1983, c. 524 and clarified the Legislature's intention for the rights of such persons to be protected in non-institutional settings. N.J.S.A. 30:6D-13.
[5] Nothing in the record before us reflects any recognition that the Legislature expressly delegated authority to the Director to extend eligibility for services to persons in T.H.'s circumstances.
[6] N.J.S.A. 30:6D-34 provides, in its entirety:

The Legislature finds and declares that:
a. It is in the best interest of the State of New Jersey to preserve, strengthen and maintain the family unit. All individuals, regardless of disability, have the right to belong to a family unit where enduring relationships can be fostered.
b. Families are the major providers of support, care, training and other services for their family member with a developmental disability living at home. Consequently, families are continually searching for ways to support family members with developmental disabilities in their homes instead of placing these individuals in a State or private institution.
c. Many families with a family member with a developmental disability experience exceptionally high financial outlays and extraordinary physical and emotional challenges, isolation, stigmatization and daily stress. Supporting families in their effort to care for their family member with a developmental disability at home is efficient, cost effective and humane; failure to provide needed supports can result in premature placement of the family member in a setting outside the home.
d. To be effective, family supports must support the entire family, must be easily accessible, flexible, culturally sensitive and individualized. They must be designed to promote interdependence, independence, productivity and integration of people with disabilities into the community. Family supports must also be built on existing social networks and naturally occurring supports including extended families, neighbors and community associations.
e. A Statewide family support policy must acknowledge that families themselves are able to define their own needs and select their own services; family supports must be chosen by families, controlled by families and monitored by families.
f. Adults with disabilities should be afforded the opportunity to make decisions for themselves, live in typical homes and communities and exercise their full rights as citizens. Adults with disabilities should have options for living separately from their families, but when this is not the case, families should be provided the supports they need.
[7] In 1995, the Division represented that it provided services to "approximately 14,000 individuals" and had "a waiting list of approximately 4,000 persons for day or residential programs." 27 N.J.R. 2157. In 2000, the Division represented that it served "approximately 24,000 individuals" and had "a waiting list of approximately 5,500 persons for residential programs." 32 N.J.R. 2020. And in 2003, N.J.A.C. 10:46-1.1(c) was added, providing that "[T]he availability of services shall be limited to the Division's funding in a given fiscal year."
[8] We do not suggest that persons whose functional limitations are evident before age twenty-two, but who may not need or seek services until a later time, when family care is no longer possible, cannot qualify under the regulation.
[9] Nonetheless, where an adult seeks services after the death of parents who took care of him in their home for his entire life, some flexibility is appropriate in considering the available evidence of the individual's early years, and in assisting the applicant in obtaining such school or medical records as may be in existence.
[10] When T.H.'s father sold the business, T.H. was kept on by the new owner, allegedly as a condition of the sale.