916 A.2d 1025

T.H., PETITIONER–APPELLANT, v. DIVISION OF DEVELOPMENTAL DISABILITIES, RESPONDENT–RESPONDENT.

Argued November 13, 2006—Decided March 1, 2007.

*S. Paul Prior*, argued the cause for appellant (*Hinkle & Fingles*, attorneys).

*Beth Leigh Mitchell*, Deputy Attorney General, argued the cause for respondent (*Stuart Rabner*, Attorney General of New Jersey, attorney; *Michael J. Haas*, Assistant Attorney General, of counsel; *Amy E. Duff*, Deputy Attorney General, on the briefs).

*Ronald K. Chen*, Public Advocate of New Jersey, argued the cause for *amicus curiae*, Public Advocate.

Justice LONG delivered the opinion of the Court.

T.H. is a fifty-five year old man who suffers from Asperger's Syndrome, a developmental disability. Like many developmentally disabled persons, T.H. was cared for by his parents for his entire lifetime. They provided for his every need and sought no outside assistance. In 2000, T.H.'s last parent died. One day later, he attempted suicide. Thereafter, his family sought services

on his behalf from the Division of Developmental Disabilities (DDD). His application was rejected because he failed to satisfy *N.J.A.C.* 10:46–1.3(2), which requires that an applicant suffer "substantial functional limitations" in three or more areas of major life activity "before the age of 22." Although DDD's own expert recognized that T.H. has suffered from Asperger's since childhood, DDD rejected the evidence proffered by T.H.'s family regarding his childhood limitations because it was "anecdotal" and not "documentary." T.H. appealed and the Appellate Division affirmed.

We hold that, because there is no statutory requirement that an applicant for services develop substantial functional limitations in three major life areas *before age 22,* the regulatory imposition of that requirement exceeded the power of DDD. We further hold that DDD's rejection of the evidence proffered by T.H.'s family, not on credibility grounds, but because it was anecdotal and not documentary, was arbitrary. Because T.H. was an adult long before Asperger's was a recognized disorder,[1] medical, educational and psychological documentation of his symptoms and treatment before age twenty-two was simply not available. The observations of his family, if believed by the Administrative Law Judge (ALJ), should have been considered an adequate substitute. We therefore reverse and remand the matter to DDD for reconsideration of T.H.'s application under the proper statutory standard giving due weight to the evidence proffered on his behalf.

## I.

The facts of the case are as follows: after T.H.'s suicide attempt, which caused him neurological damage, he was treated sequentially in a rehabilitation facility, a nursing home, and a group home, paid out of his parents' estate. By 2003, his care and housing cost $72,000 a year. At that rate, the remaining estate

---

[1] *Compare* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (revised 3d ed. 1987) (*DSM–III–R*), *with* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (Text Revision)* § 299.80, at 80 (4th ed. 2000) (*DSM–IV–TR*).

funds would have been exhausted by February 2004, at which time T.H. could no longer remain in the home unless he was declared eligible for services from DDD.

T.H.'s family applied for services on his behalf pursuant to *N.J.S.A.* 30:4–25.2. DDD staff interviewed T.H. and his family. Finding a "paucity of documentation" concerning T.H.'s developmental history, and noting that most of that history derived from "anecdotal" accounts by T.H. and his family, DDD determined that T.H. was ineligible for services because he showed no evidence of substantial functional limitations in three major life areas prior to the age of twenty-two, as required under *N.J.A.C.* 10:46–1.3. DDD also concluded that T.H.'s recent brain trauma hindered extrapolation of any functional limitations that may have been present prior to age twenty-two. T.H. was recognized as presenting a "very complex and difficult picture;" however, "[i]n the absence of available retrospective data, DDD [was] unable to" declare him eligible for services.

T.H. challenged the decision, and the matter was transferred to the Office of Administrative Law (OAL) as a contested case. J.S., T.H.'s older sister and guardian, testified as the representative of all of his siblings. Although she acknowledged that T.H. suffered physical limitations and short-term memory loss as a result of the suicide attempt, she underscored that his basic condition remained as it had been before that incident. She stated that T.H.'s symptoms were already evident at six years of age and significant enough that evaluating psychologists recommended that he be placed in a group home. The family refused, choosing instead to care for him themselves.

J.S. described T.H.'s lifelong rigidity, reclusive behavior and obsessive preoccupations and related those characteristics to T.H.'s social isolation. Indeed T.H. had, in his lifetime, no close personal connections except for his parents and one boy when he was four years old. According to J.S., T.H. would not attend family gatherings and avoided all social interactions, going so far as to miss work on days that social events were scheduled. J.S.

further reported that T.H.'s social isolation was exacerbated by his inability to make eye contact during conversations and his constant monologues on matters of little or no interest to his listener. Indeed he rigidly refused to discuss any subjects other than advanced astronomy, his rejection by a girl he had asked for a date when he was nineteen years old, and more recently, the Jehovah's Witnesses' belief that the end of the world is coming.

T.H.'s obsessive behaviors also extended to his personal habits. For example, he ate the same meal for dinner every night of his life and became agitated if any aspect of that meal changed, including the presence of ice in his drink. In addition, according to his employer, he ritualistically clocked in and out of work at the exact same second each day.

In terms of T.H.'s employment history, J.S. underscored that that employment was arranged by their father in the family business, and later was a condition of the sale of the family business to outsiders. Although T.H. could carry out the meticulous and repetitive tasks of an expediter for which he was paid, J.S. stated that T.H. had no understanding of the value of money and was totally incapable of handling the most elementary aspects of his own finances. According to J.S., T.H., who never made a bank deposit or withdrawal in his life, once spent $13,000 to have a car that he had owned since 1969 repainted.

In terms of self care, T.H. had never prepared a meal, shopped for food, done laundry, or kept house. He also refused to tend to his personal hygiene at all, unless prodded. Thus, J.S. was of the opinion that even before the suicide attempt, her brother would never have been able to live on his own.

Linda Ann Petti, Ph.D., a psychologist who specializes in providing comprehensive cognitive rehabilitation counseling and psychoeducational and therapeutic services, testified on T.H.'s behalf. She explained that Asperger's Disorder is incurable and usually results in limitations in the sufferer's daily functioning, which can be severe. From her interviews with T.H. and his family, she found that T.H. was functionally intelligent, but as a result of

Asperger's Disorder, was rigid in his behaviors and maladaptive to change; suffered from obsessive preoccupations; was withdrawn and self-isolated; fearful of the unfamiliar; incapable of reciprocal social interaction; could not understand money and finances; and was unable to gain and hold competitive employment. Dr. Petti concluded that T.H. was not capable of economic self-sufficiency or independent living. She also opined that, because he could not form appropriate peer relationships, he suffered a substantial functional limitation in the area of self-direction. She stated that T.H.'s personal hygiene practices were "highly inadequate" in terms of frequency, and because of his inability to shop for or prepare food, that he suffered a substantial functional limitation in the area of self-care. She also testified that T.H. suffered from substantial functional limitations in the area of language, due to his rigid literalism, which results in an inability to comprehend humor, sarcasm, or metaphor and renders T.H. highly vulnerable to exploitation.

Dr. Petti concluded that T.H.'s limitations pre-dated his suicide attempt and existed prior to his reaching the age of twenty-two. Indeed, she stated that the symptoms of Asperger's Disorder manifest in early childhood and are "very ingrained, very severe . . . and tend to grow worse and more embedded with time."

Arthur J. Bernstein, Ph.D., a psychologist employed by DDD, testified on its behalf. He recognized that Asperger's Disorder is a chronic, incurable, sometimes severe disability that is present from early childhood and agreed that T.H.'s Asperger's "was manifest or made present before the age of 22." Characterizing the case as "very complicated," Dr. Bernstein testified that DDD denied eligibility "because there was no concrete data other than anecdotal that [T.H.] had an intellectual or adaptive impairment that was severe and chronic prior to the age of 22." Dr. Bernstein added that it was difficult to ascertain T.H.'s limitations prior to age twenty-two because of the intervening brain trauma caused by his suicide attempt in 2000. He concluded that the available evidence indicated no substantial functional limitations before age

twenty-two, observing that T.H. attended public school and technical school, drove a car, and maintained employment in his adult life.

The ALJ recommended affirmance of the denial of services. In doing so, he specifically rejected the conclusions of T.H.'s expert, Dr. Petti, because they were based on "anecdotal commentary at best from just a couple of people around T.H. as well as ... T.H. himself." The ALJ noted that because of the "absolute dire paucity of any documentation whatsoever on behalf of T.H." relating his limitations to his condition prior to age twenty-two, T.H. had failed to demonstrate by a preponderance of the evidence that he met the statutory and regulatory criteria for eligibility. Thereafter, the Director of DDD adopted the findings and conclusions of the ALJ. T.H. appealed.

The Appellate Division affirmed. *T.H. v. Div. of Developmental Disabilities,* 381 *N.J.Super.* 366, 382, 886 *A.*2d 194 (App.Div.2005). In so doing, the panel characterized the case as a "close" one, but in the end was "convinced that [*N.J.A.C.* 10:46–1.3—the regulation defining developmental disability] is valid and enforceable," and that "there is sufficient credible evidence to support the [ALJ's] initial decision." *Id.* at 370, 382, 886 *A.*2d 194.

T.H. filed a petition for certification that we granted. *T.H. v. Div. of Developmental Disabilities,* 186 *N.J.* 605, 897 *A.*2d 1060 (2006). We also granted the motion of the Public Advocate to appear as amicus curiae.

## II.

First recognized during the 1990's, Asperger's Disorder, a mental disability that falls on the higher end of the autism spectrum, is characterized by a "severe and sustained impairment in social interaction ... the development of restricted, repetitive patterns of behavior, interests, and activities ... [and results in] significant impairment in social, occupational, or other important areas of functioning." *See DSM–IV–TR; Stedman's Medical Dictionary* 568 (28th ed. 2006). It is a "serious and debilitating developmen-

tal syndrome impairing the person's capacity for socialization and not a transient or mild condition." *See* Ami Klin & Fred R. Volkmar, *Asperger's Syndrome: Guidelines for Assessment and Diagnosis* (Learning Disabilities Association of America 1995), http://www.med.yale.edu/chldstdy/ autism/asdiagnosis.pdf.

The DSM–IV provides the following standard for diagnosing Asperger's:

A.  Qualitative impairment in social interaction, as manifest by at least two of the following:

(1) marked impairment in the use of multiple nonverbal behaviors such as eye-to-eye gaze, facial expression, body postures, and gestures to regulate social interaction

(2) failure to develop peer relationships appropriate to developmental level

(3) a lack of spontaneous seeking to share enjoyment, interests, or achievements with other people (e.g., by a lack of showing, bringing, or pointing out objects of interest to other people)

(4) lack of social or emotional reciprocity

B.  Restricted, repetitive and stereotyped patterns of behavior, interests, and activities, as manifest by at least one of the following:

(1) encompassing preoccupation with one or more stereotyped and restricted patterns of interest that is abnormal either in intensity or focus

(2) apparently inflexible adherence to specific, nonfunctional routines or rituals

(3) stereotyped and repetitive motor mannerisms (e.g., hand or finger flapping or twisting, or complex whole-body movements)

(4) persistent preoccupation with parts of objects

C.  The disturbance causes clinically significant impairment in social, occupational, or other important areas of functioning.

D.  There is no clinically significant general delay in language (e.g., single words used by age 2 years, communicative phrases used by age 3 years).

E.  There is no clinically significant delay in cognitive development or in the development of age-appropriate self-help skills, adaptive behavior (other than in social interaction), and curiosity about the environment in childhood.

F.  Criteria are not met for another specific Pervasive Developmental Disorder or Schizophrenia.

[*DSM–IV–TR, supra,* at 84].

Features of Asperger's Disorder generally become apparent in children between three and five years of age, in some cases earlier. *See DSM–IV–TR* § 299.80, *supra,* at 80, 81; Stephen Bauer, *Asperger Syndrome: The Preschool Child* (1996), http:// www.aspennj.org/bauer.html; National Institute of Neurological

Disorders and Stroke (NINDS), *Asperger Syndrome Fact Sheet: What is Asperger Syndrome?*, http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm. Today, children with Asperger's Disorder are ordinarily diagnosed between six and ten years of age. *See* Ernst O. VanBergeijk & Oren Shtayermman, *Asperger's Syndrome: An Enigma for Social Work*, 12 *J. of Hum. Behav. in the Soc. Env't* 23, 24 (2005). However, because the condition was not recognized or classified as a disorder until recently, many adult sufferers never received a diagnosis or treatment. *See* Families of Adults Affected by Asperger's Syndrome, http://www.faaas.org. Therefore, medical, psychiatric, and educational documentation of their early condition is unavailable. However, clinicians regularly diagnose and treat Asperger's Disorder based on information supplied by family members. *See* VanBergeijk & Shtayermman, *supra*, at 24 (stating that family members are extremely important source of information in assessing Asperger's cases).

## III.

In 1975, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act, *P.L.* 94–103, 89 *Stat.* 486. 42 *U.S.C.S.* § 15001 to –15009 (2007) (mandating protection of civil rights of persons with developmental disabilities and providing funding to achieve that goal). The federal act defines developmental disability in relevant part as follows:

(8) Developmental disability.

(A) In general. The term "developmental disability" means a severe, chronic disability of an individual that-

(i) is attributable to a mental or physical impairment or combination of mental and physical impairments;

(ii) is manifested before the individual attains age 22;

(iii) is likely to continue indefinitely;

(iv) results in substantial functional limitations in 3 or more of the following areas of major life activity:

(I) Self-care.

(II) Receptive and expressive language.

(III) Learning.

(IV) Mobility.

(V) Self-direction.

(VI) Capacity for independent living.

(VII) Economic self-sufficiency; and

(v) reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.

(B) Infants and young children. An individual from birth to age 9, inclusive, who has a substantial developmental delay or specific congenital or acquired condition, may be considered to have a developmental disability without meeting 3 or more of the criteria described in clauses (i) through (v) of subparagraph (A) if the individual, without services and supports, has a high probability of meeting those criteria later in life.

[42 *U.S.C.A.* § 15002(8).]

To obtain federal funding, New Jersey, like every other state, enacted its own Developmentally Disabled Rights Act (DDRA), *N.J.S.A.* 30:6D–1 to –12, in 1977. The DDRA, in turn, protects certain "fundamental rights" of persons who are institutionalized or receive services because of a developmental disability and tracks the federal definition of "developmental disability" as follows:

"Developmental disability" means a severe, chronic disability of a person which:

(1) is attributable to a mental or physical impairment or combination of mental or physical impairments;

(2) is manifest before age 22;

(3) is likely to continue indefinitely;

(4) results in substantial functional limitations in three or more of the following areas of major life activity, that is, self-care, receptive and expressive language, learning, mobility, self-direction and capacity for independent living or economic self-sufficiency; and

(5) reflects the need for a combination and sequence of special inter-disciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated. Developmental disability includes but is not limited to severe disabilities attributable to mental retardation, *autism,* cerebral palsy, epilepsy, spina-bifida and other neurological impairments where the above criteria are met;

[*N.J.S.A.* 30:6D–3(a).]

The Developmental Disabilities Act (DDD Act), *N.J.S.A.* 30:6D–23 to –32, that established DDD to provide required services to the developmentally disabled, contains the identical definition.

*N.J.S.A.* 30:6D–25(b). Under the DDD Act, the Commissioner of the Department of Human Services has the authority to promulgate "rules and regulations necessary to effectuate the [Act's] purposes." *N.J.S.A.* 30:6D–32; *N.J.S.A.* 30:6D–25(a). In 1990, pursuant to that grant, DDD enacted regulations that adopted verbatim the definition of "developmental disability" contained in *N.J.S.A.* 30:6D–3(a) and *N.J.S.A.* 30:6D–25(b). Those regulations were amended in 1995. 27 *N.J.R.* 2157(a) (June 5, 1995). The 1995 version remains in effect and defines "developmental disability" as:

> a severe, chronic disability of an individual which:
>
> 1. Is attributable to a mental or physical impairment or combination of mental or physical impairments;
>
> 2. Is manifest before age 22;
>
> 3. Is likely to continue indefinitely;
>
> 4. Results in substantial functional limitations *before the age of 22* in three or more of the following areas of major life activity:
>
>> i. Self-care;
>>
>> ii. Receptive and expressive language;
>>
>> iii. Learning;
>>
>> iv. Mobility;
>>
>> v. Self-direction; and/or
>>
>> vi. Capacity for independent living or economic self-sufficiency; and
>
> 5 Reflects the need for a combination and sequence of special interdisciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated.
>
> 6. Developmental disability includes, but is not limited to, severe disabilities attributable to mental retardation, autism, cerebral palsy, epilepsy, spina bifida and other neurological impairments where the above criteria are met.
>
> [*N.J.A.C.* 10:46–1.3 (emphasis added).]

It is the underscored change that is at the heart of this appeal because it is the basis on which T.H.'s application was denied.

## IV.

T.H. argues that the definition of "developmental disability" in *N.J.A.C.* 10:46–1.3 conflicts with the corresponding statutory provision in *N.J.S.A.* 30:6D–3(a) and *N.J.S.A.* 30:6D–25(b) insofar as it requires three functional limitations to be exhibited

before age twenty-two. He further contends that the burden of proof and persuasion should rest on DDD, or, alternatively, should shift to DDD once an applicant makes a prima facie showing. The Public Advocate supports those positions and additionally advances the contention that the evidence supplied by T.H. was sufficient to satisfy the statutory standard.

DDD counters that its regulation is supported by the plain language of the statute and its history; that it mirrors the Legislature's intent to base eligibility on functional limitations and not on mere diagnosis; that the burden is on an applicant for services to prove eligibility; and that the case presented by T.H. fell short of satisfying the statutory and regulatory criteria necessary to trigger services.

## V.

That the Legislature may delegate to an administrative agency the authority to promulgate rules and regulations interpreting and implementing a statute is beyond peradventure. *N.J. Chamber of Commerce v. N.J. Election Law Enforcement Comm.*, 82 *N.J.* 57, 82, 411 *A.*2d 168 (1980). An agency's regulations adopted pursuant to a legislative mandate or grant of authority enjoy presumptive validity. *In re Adoption of N.J.A.C. 7:26B*, 128 *N.J.* 442, 449, 608 *A.*2d 288 (1992); *see also In re N.J. Tpk. Auth. v. Am. Fed'n of State, County, & Municipal Employees, Council 73*, 150 *N.J.* 331, 351, 696 *A.*2d 585 (1997) (noting that interpretation of agency charged with enforcing statute is entitled to "substantial deference" (internal quotation marks omitted)); *D.D. v. N.J. Div. of Developmental Disabilities*, 351 *N.J.Super.* 308, 317, 798 *A.*2d 148 (App.Div.2002) (explaining judicial respect for agency's expertise in interpreting its regulations). Thus, an agency's interpretation of a statute will prevail unless it is "plainly unreasonable." *N.J. Tpk. Auth., supra*, 150 *N.J.* at 351, 696 *A.*2d 585 (internal quotation marks omitted).

However, the deference afforded regulations "does not go so far as to permit an administrative agency under the guise of

an administrative interpretation to give a statute any greater effect than is permitted by the statutory language." *In re N.J.A.C. 7:26B, supra,* 128 *N.J.* at 450, 608 *A.*2d 288. Nor can agency regulations "alter the terms of a legislative enactment or frustrate the policy embodied in the statute." *N.J. Chamber of Commerce, supra,* 82 *N.J.* at 82, 411 *A.*2d 168; *see also N.J. Tpk. Auth., supra,* 150 *N.J.* at 351, 696 *A.*2d 585 (explaining that if agency's interpretation undermines Legislature's intent no deference is required). If a regulation is "plainly at odds with the statute, [the court] must set it aside." *In re Freshwater,* 180 *N.J.* 478, 489, 852 *A.*2d 1083 (2004). As we have repeatedly stated, the judicial role is to ensure that an agency's action does not violate express and implied legislative intent. *See, e.g., Id.; N.J. Tpk. Auth., supra,* 150 *N.J.* at 351, 696 *A.*2d 585; *In re Petitions for Rulemaking, N.J.A.C. 10:82–1.2 and 10:85–4.1,* 117 *N.J.* 311, 325, 566 *A.*2d 1154 (1989). Thus, the meaning of enabling legislation is pivotal to any analysis of the legitimacy of a rule.

At the heart of this case is DDD's regulation that applies the "before age 22" language in subsection (2) of *N.J.S.A.* 30:6D–3(a) and *N.J.S.A.* 30:6D–25(b) to subsection (4) of the statutes. DDD's essential theory is that because a developmental disability under Title 30 is a statutory construct, the Legislature was free to require that substantial functional limitations occur before age twenty-two in order for a developmental disability to be manifest. We agree. The issue is whether it did so. Our review of the language, structure, history, and policies underlying *N.J.S.A.* 30:6D–3 and *N.J.S.A.* 30:6D–25 lead us to conclude that it did not and that DDD's contrary interpretation, codified in *N.J.A.C.* 10:46–1.3(b)(4), exceeded its authority.

■ Ordinarily, we derive a statute's meaning from its language. *State v. Sutton,* 132 *N.J.* 471, 625 *A.*2d 1132 (1993). *N.J.S.A.* 30:6D–3 and *N.J.S.A.* 30:6D–25 could not be plainer. They impose the "before age 22" limit on subsection (2) and not on subsection (4), indicating rather clearly that the Legislature intended the restriction to apply to the former but not the latter.

In other words, the condition must manifest before age twenty-two but functional limitations are not so circumscribed. Indeed, it is well settled that where the Legislature specifically includes a requirement in one subsection of a statute but not in another, the term should not be supplied where it has been omitted. *Higgins v. Pascack*, 158 *N.J.* 404, 419, 730 *A.*2d 327 (1999); *see also Marshall v. Western Union*, 621 *F.*2d 1246, 1251 (3d Cir.1980) (stating that "[u]nder the usual canons of statutory construction, where [the Legislature] has carefully employed a term in one place and excluded it in another, it should not be implied where excluded").

That rule of interpretation is particularly apt where the sense of a statute leads to the same conclusion. That is the case here. Subsections (2) and (4) of the statutes are quite distinct. Subsection (2) addresses whether the symptoms of the condition, in fact, showed themselves during the period of childhood development, thus broadly satisfying the notion of a developmental disability. *See* 6 *U.S. Cong. & Admin. News* '78 8, 8 (1978). Hence, the age limit is included. In contrast, subsection (4) addresses the extent of an applicant's disability, and must be assessed *at the time of the application* for a practical reason: because that is the point at which DDD must determine eligibility.

Accordingly, although DDD is correct in arguing that the Legislature intended to base eligibility on functional limitations, it has exceeded its power in attempting to freeze those limitations "before age 22" and not at the time of application. DDD is equally wide of the mark in arguing that an applicant's condition cannot be "manifest" unless all the criteria of the statute are met. Clearly, an applicant can show the symptoms or characteristics of a disorder without satisfying the full panoply of requirements in subsection (4) by, for example, meeting the DSM–IV diagnostic criteria. *See Stedman's Medical Dictionary, supra,* at 568 (defining "manifest" as "[t]he display or disclosure of characteristics or symptoms of an illness"). Indeed, DDD's own expert in this case, Dr. Bernstein, acknowledged that T.H.'s Asperger's Disorder "was

*manifest* or made present before the age of 22" even though, in his estimation, there was no evidence of substantial functional limitations in three major life areas before that time.

■ Further, in enacting the New Jersey Infantile Autism Biomedical Research Act the Legislature stated that "autism spectrum disorders generally *manifest* in young children some-time during the first two years of life." *N.J.S.A.* 30:6D–57 (2007) (originally enacted in 1999) (emphasis added). Obviously, a child under two years of age cannot demonstrate substantial functional limitations in three or more areas of major life activity (e.g. self-care, independent living, language, learning, self-direction, etc.). Yet the Legislature recognized that autism spectrum disorders can nevertheless be "manifest" in such young children. That understanding of the term "manifest" is entirely out of synchronic-ity with DDD's position here. It is well settled that when the Legislature uses the same term in cognate statutes, unless it expressly provides otherwise, the term should be given the same meaning in both. *G.S. v. Dept. of Human Serv., Div. of Youth & Family Serv.*, 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999); *State v. Federanko*, 26 *N.J.* 119, 129, 139 *A.*2d 30 (1958); *State v. Brown*, 22 *N.J.* 405, 415, 126 *A.*2d 161 (1956). There is simply nothing to suggest that the Legislature intended the word "manifest" in *N.J.S.A.* 30:6D–3 and *N.J.S.A.* 30:6D–25 to mean something differ-ent than it means in *N.J.S.A.* 30:6D–57.

To be sure, as DDD argues, all elements of the statute must be satisfied in order for eligibility to occur. Thus, an individual who manifests a disorder before age twenty-two but who does not suffer the required substantial functional limitations in three major life areas *at the time of application* will not qualify for services under the statute. However, we see no statutory authori-ty for DDD's obverse conclusion that the substantial functional limitation in three major life areas was likewise intended to be frozen before age twenty-two. That interpretation excludes, with-out explanation, the entire class of applicants who suffer from a disorder in childhood but whose functional limitations do not

satisfy subsection (4) (three major areas of life activity) until some later point. Given that remedial and humanitarian statutes like the DDRA and the DDD Act should be liberally construed to achieve their beneficent purposes, the crabbed interpretation advanced here by DDD cannot be countenanced in the absence of some indication that the Legislature so intended.

We note further that there is nothing in the federal act or regulations on which our statute is modeled to support DDD's view. Like our statute, they do not require that functional limitations manifest before age twenty-two. *See* 42 *U.S.C.A.* § 15002; 45 *C.F.R.E.* § 1385.3 (2007). Nor, has any other state narrowed the "functional limitations" category as has DDD here, either by statute or regulation.[2] In other words, the understanding of other state legislatures and state program administrators regarding the effectuation of the federal act is that the age twenty-two qualifier does not apply to functional limitations. DDD is alone among its cohort in restricting statutory eligibility that way.[3]

Although we recognize the deference that an administrative agency regulation is ordinarily accorded, we repeat here the well-established principle that that deference is not warranted where the agency alters the terms of a legislative enactment. This is not

---

[2] *See, e.g.,* Cal.Welf. & Inst.Code § 4512 (2006) and 17 *C.C.R.* § 54000 (2007); 405 *Ill. Comp.Stat.* § 5/1–106 (2007) and 2 Ill. *Admin.Code* § 2900.200 (2007); *Ind.Code* § 12–7–2–61 (2006) and 431 *Ind.Admin.Code* § 1.1–1–12 (2006); *Ky. Rev.Stat. Ann.* § 347.020 (2006) and 902 *Ky.Admin.Regs.* § 20:078 (2006); *N.H. Rev.Stat.Ann.* § 19–J:1 (2006) and *N.H.Code Admin.R.Ann. HE–M* § 309.02 (2006); *N.Y. Mental Hyg. Law* § 1.03 (Consol. 2006) and *N.Y. Comp.Codes R. & Regs.* 14, § 680.13 (2007); Tex. Health & Safety Code Ann. § 614.001 (2006) and 40 *Tex.Admin.Code* § 876.1 (2007); *Wis.Stat.* § 51.01 (2006) and *Wis.Admin.Code HFS* § 61.022 (2006).

[3] Although not argued, we note that it appears DDD's interpretation may violate 42 *U.S.C.A.* § 15002(8), in particular subsection (B) with respect to children under nine years of age. *See* 45 *C.F.R.E.* § 1385.3 (2007) (explaining that "any State eligibility definition of developmental disability or policy statement which is more restrictive than that of the Act does not apply as the Act takes precedence").

a case in which an agency simply filled in the interstices of an act or provided details specifically left to it by the Legislature. Rather, in adopting *N.J.A.C.* 10:46–1.1 to –6.1, DDD added an eligibility standard that does not exist in *N.J.S.A.* 30:6D–3 and *N.J.S.A.* 30:6D–25. That regulation, therefore, is not entitled to deference.

In sum, we hold that *N.J.A.C.* 10:46–1.3 violates *N.J.S.A.* 30:6D–3 and *N.J.S.A.* 30:6D–25 insofar as it adds an eligibility requirement not contemplated by the Legislature and accordingly narrows the sweep of the statute. Given that the decision under review was based on an application of that invalid regulation, it must be reversed and the case remanded for consideration under the proper standard.

### VI.

Because further proceedings are required, the approach of the DDD to the testimony of T.H.'s family requires some comment. Despite acknowledging the right of an applicant to demonstrate eligibility through "retrospective data," DDD's expert, the ALJ, and DDD refused to credit the testimony of T.H.'s sister, not because she was not credible, but because it was "anecdotal" and not "documentary." For the same reason, the ALJ rejected the conclusions of T.H.'s expert, Dr. Petti.

Although this case certainly is complicated by the neurological effects of T.H.'s suicide attempt, his family testified unequivocally regarding his condition immediately prior to the suicide attempt, and recounted in detail that his fundamental limitations long preceded the attempt, dating back to his childhood. We can think of no more relevant and probative evidence than testimony of relatives who lived with T.H. and his problems—year in and year out—over a lifetime. To rule otherwise would be to punish families that choose to care for their disabled children in lieu of placing them in a facility. Yet, the State's expert viewed that testimony as deficient because it was "anecdotal;" and the ALJ, whose decision was adopted by the Director, faulted T.H.'s presen-

tation, including that of his expert, because it was not based on "medically corroborating documentation" of his early condition. That approach denied T.H. a fair hearing because it essentially took away his opportunity to establish his eligibility retroactively. What is clear to us is that the eyewitness testimony of T.H.'s sister was sufficient to support his expert's conclusion and, if believed by the trier of fact,[4] to sustain a determination that he suffered the delineated substantial functional limitations in three life areas prior to his suicide attempt. Any further proceedings should be conducted with that in mind.[5]

## VII.

The judgment of the Appellate Division is reversed. The case is remanded to DDD for proceedings consistent with the principles to which we have adverted.

*For reversal and remandment*—Chief Justice ZAZZALI, Justices LONG, LaVECCHIA, ALBIN, WALLACE, and RIVERA–SOTO—6.

Opposed—None.

---

[4] Nothing in the ALJ's opinion suggests that he did not believe the testimony of T.H.'s sister.

[5] Because T.H. did not raise the question of the burdens of production and persuasion below and because, under the unique circumstances presented, we do not view the issue as having the capacity to affect the outcome, it will not be addressed here.