23 A.3d 451

MANUEL GUAMAN, MARIA GUAMAN, NADIA CHERY, DEYINIRA
VALENZUELA, ROSA RODRIGUEZ AND KEITHON BLAKE,
PLAINTIFFS–APPELLANTS, v. JENNIFER VELEZ, COMMIS-
SIONER OF NEW JERSEY DEPARTMENT OF HUMAN SER-
VICES AND JOHN GUHL, DIRECTOR, DIVISION OF MEDICAL
ASSISTANCE AND HEALTH SERVICES, DEFENDANTS–RE-
SPONDENTS.

Superior Court of New Jersey
Appellate Division

Motion Argued April 5, 2011—Decided July 12, 2011.

Before Judges CARCHMAN, GRAVES and MESSANO.

*Jennifer B. Condon* argued the cause for appellants (*Seton Hall University School of Law Center for Social Justice and Gibbons, P.C.*, attorneys; *Ms. Condon, Baher Azmy, Rachel Lopez,* and *Lawrence S. Lustberg,* on the brief).

*Dianna Rosenheim,* Deputy Attorney General, argued the cause for respondent Department of Human Services, Division of Medical Assistance and Health Services (*Paula T. Dow,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Ms. Rosenheim,* on the brief).

*Brett D. Kahn* argued the cause for amicus curiae New Jersey Appleseed Public Interest Law Center; New Jersey Policy Perspective; New Jersey Citizen Action; State Parent Advocacy Network; Family Voices of New Jersey; Next Step; New Jersey Working Families Alliance; Blue Wave; South Jersey Chapter of the National Organization of Women; The Unitarian Universalist Legislative Ministry of New Jersey; The Lutheran Office of Governmental Ministry in New Jersey; Latino Action Network ; and Democracia (*McCarter & English, LLP*, attorneys; *John C. Kelly* and *Emily B. Goldberg,* of counsel and on the brief; *Mr. Kahn, Amy T. Klug,* and *Lauren S. Jones,* on the brief).

The opinion of the court was delivered by

MESSANO, J.A.D.

Plaintiffs are legal resident aliens who have resided in this country for less than five years. They seek emergent relief enjoining enforcement of Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2, as amended and adopted on May 28, 2010, which authorized termination of their enrollment in the NJ FamilyCare Program (FamilyCare), a state-funded Medicaid program offering subsidized health insurance to qualifying low-income adults and children. Pursuant to the issuance of the communication by the Division of Medical Assistance and Health Services (the Division), and adoption of the regulation by the Department of Human Services (DHS, and collectively, defendants), several thousand legal resident aliens were terminated from FamilyCare, and several thousand more became ineligible to enroll, resulting in an estimated $29.8 million in savings for the State. *See id.* at 1405. Plaintiffs argue that the agency actions are ultra vires, violate the equal protection guarantees of the Federal and State Constitutions, and will cause them to suffer irreparable harm unless injunctive relief is ordered.

On January 11, 2011, we granted plaintiffs leave to file a motion for emergent relief on an expedited basis and ordered briefing of the issues presented. In the interim, plaintiffs moved: 1) to file a proposed class member's certification under seal because disclosure of his identity would pose a risk to his safety from terrorist groups in his native country; and 2) to permit thirteen organizations to appear as amici curiae.[1] We granted those motions and heard oral argument from the parties and amici on April 5, 2011.

■ "[A] party who seeks mandatory preliminary injunctive relief must satisfy a 'particularly heavy' burden." *Rinaldo v. RLR Inv., LLC,* 387 *N.J.Super.* 387, 396, 904 *A.*2d 725 (App.Div.2006) (quoting *Punnett v. Carter,* 621 *F.*2d 578, 582 (3d Cir.1980)). A

---

[1] On September 30, 2010, Judge Feinberg signed a consent order transferring the case to the Appellate Division pursuant to *Rule* 1:13–4 on the basis that the appellate court had jurisdiction under *Rule* 2:2–3(a)(2).

successful applicant must demonstrate by clear and convincing evidence, *Am. Emp'rs' Ins. Co. v. Elf Atochem N. Am.*, 280 *N.J.Super.* 601, 610–611 n. 8 (App.Div.1995), that a stay is necessary to prevent irreparable harm, that the legal right underlying the claim is settled, that the material facts are substantially undisputed, that the applicant has a reasonable probability of success on the merits, and that a balancing of the equities and the hardships weighs in favor of granting relief. *Crowe v. De Gioia*, 90 *N.J.* 126, 132–34, 447 *A.2d* 173 (1982). Having considered the arguments raised in light of the record and these applicable legal standards, we deny plaintiffs' motion for a preliminary injunction staying enforcement of Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2.

## I.

We review the relevant statutory framework and provide some factual and procedural background that is undisputed.

■ While each State has significant discretion in designing its own Medicaid programs, *A.K. v. Div. of Med. Assistance & Health Servs.*, 350 *N.J.Super.* 175, 178–79, 794 *A.2d* 835 (App.Div.2002), they are subject to the approval of the United States Secretary of Health and Human Services, and each state must comply with the minimum requirements imposed by the Federal Medicaid Act in order to receive federal matching funds. *Atkins v. Rivera*, 477 *U.S.* 154, 157, 106 *S.Ct.* 2456, 2458, 91 *L.Ed.2d* 131, 137 (1986); 42 *U.S.C.A.* § 1396a.

In 1968, New Jersey elected to participate in the Medicaid program by enacting the " 'New Jersey Medical Assistance and Health Services Act,' " *N.J.S.A.* 30:4D–1 to–19.5, administered by DHS through the Division. *N.J.S.A.* 30:4D–3(c) and 30:4D–4. The program enables the State:

> [T]o provide medical assistance, *insofar as practicable*, on behalf of persons whose resources are determined to be inadequate to enable them to secure quality medical care at their own expense, and to enable the State, *within the limits of*

*funds available for any fiscal year for such purposes,* to obtain all benefits for medical assistance provided by the Federal Social Security Act.
[*N.J.S.A.* 30:4D-2 (emphasis added).]

As originally enacted, our statute conformed to the broad federal eligibility guidelines which then mandated coverage for non-citizen lawful permanent residents regardless of their date of entry or length of residency in the United States. *L.* 1968, *c.* 413. *See Monmouth Med. Ctr. v. Hau Kwok,* 183 *N.J.Super.* 494, 497, 444 *A.*2d 610 (App.Div.1982); 45 *C.F.R.* § 233.50 (1973); 42 *C.F.R.* § 435.402(b) (1990). A " '[q]ualified applicant' " was initially defined as "a resident of this State ... determined to need medical care and services as provided under this act[.]" *L.* 1968, *c.* 413. *See Monmouth Med. Ctr., supra,* 183 *N.J.Super.* at 496, 444 *A.*2d 610 (quoting *N.J.A.C.* 10:94–3.2 (supp.12–8–76)(repealed 2010)). (an " 'applicant must be a resident of the United States who is either a citizen or an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law' ").

In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), 8 *U.S.C.A.* §§ 1601 to 46, and significantly limited a non-citizen's access to federally-subsidized medical benefits. *A.B. v. Div. of Med. Assistance & Health Servs.,* 407 *N.J.Super.* 330, 343, 971 *A.*2d 403 (App.Div.), *certif. denied,* 200 *N.J.* 210, 976 *A.*2d 386 (2009). PRWORA's self-declared purpose was "to remove the incentive for illegal immigration provided by the availability of public benefits." 8 *U.S.C.A.* § 1601(6).

To that end, PRWORA divided aliens into two categories—qualified and unqualified—and limited Medicaid eligibility to "qualified aliens," which it narrowly defined as lawful permanent residents, designated refugees, aliens granted asylum, and other specified categories of lawfully-present aliens. 8 *U.S.C.A.* §§ 1612(b), 1641(b). Only qualified aliens who entered the country prior to August 22, 1996, or otherwise lived in the country for five years from the date of lawful permanent resident designation (the five-year bar), however, were eligible for non-emergency

federal Medicaid benefits. 8 *U.S.C.A.* §§ 1612(b)(2)(B), 1613(a). For all intents and purposes, federally-funded Medicaid is largely unavailable for people arriving in the United States after August 22, 1996 unless they have resided in this country for at least five years. 8 *U.S.C.A.* § 1613(a). Further, PRWORA provided:

> With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits ..., *a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.*
> [8 *U.S.C.A.* § 1601(7) (emphasis added).]

Nonetheless, PRWORA permits States to provide State-funded benefits to aliens not otherwise eligible for federal Medicaid benefits. 8 *U.S.C.A.* §§ 1622(a), 1624(a). States may elect to offer state-funded coverage to all, some, or no qualified aliens residing in the United States for less than five years.

Our legislature thereafter amended the statutory definition of " '[q]ualified applicant' " to mean "a person who is a resident of this State, and either a citizen of the United States or an eligible alien[.]" *N.J.S.A.* 30:4D–3(i). An " '[e]ligible alien' " was defined, in part, as "a lawful permanent resident" who entered the United States prior to August 22, 1996, or if entry occurred after August 22, 1996, "who entered the United States at least five years ago." *N.J.S.A.* 30:4D–3(q).

In 2005, the Legislature adopted The Family Health Care Coverage Act (FHCCA), *N.J.S.A.* 30:4J–8 to–19, which re-established, reformed, and expanded a prior program to provide subsidized health insurance coverage to qualifying children, pregnant women, and low-income parents, guardians, and individuals, *"within the limits of funds appropriated or otherwise made available for the program." N.J.S.A.* 30:4J–12(a) (emphasis added).[2] The new FamilyCare program was intended to address the "most

---

[2] FHCCA repealed NJ KidCare, *N.J.S.A.* 30:4I–1 to–5, and NJ FamilyCare, *N.J.S.A.* 30:4J–1 to–4, and consolidated these programs under the new NJ FamilyCare program. *N.J.S.A.* 30:4J–9.

serious health problem" facing state residents, namely, the "lack of access to affordable health care coverage," which forced "families to go without needed preventive and other nonemergency care until serious illness require[d] expensive hospital care." *N.J.S.A.* 30:4J–9(a). The program, which was re-opened to parents and other low-income adults, was designed, in part, to reduce State appropriations for charity care.

The FHCCA defined a " '[q]ualified applicant' " as a low income child, parent or caretaker, or single adult or couple without children, who had no health insurance, was ineligible for Medicaid, was a resident of the state, and was "a citizen of the United States, or ha[d] been lawfully admitted for permanent residence into and remain[ed] lawfully present in the United States[.]" *N.J.S.A.* 30:4J–11. Thus, in contrast to other state Medicaid programs, the Legislature elected to offer FamilyCare benefits to qualified aliens otherwise ineligible for federal Medicaid because of the five-year bar. DHS readopted the prior FamilyCare regulations, *N.J.A.C.* 10:78–1.1 to–11.5, and, in accordance with the statutory scheme, all otherwise-qualified aliens lawfully admitted for permanent residence were eligible to participate in the program regardless of the date of entry into the country or length of residency. *N.J.A.C.* 10:78–3.2(a) (amended 2010); 38 *N.J.R.* 2606 (June 19, 2006); 38 *N.J.R.* 4225 (October 2, 2006).

Eligibility for FamilyCare was expanded by the Legislature in 2008 when it enacted the "New Jersey Health Care Reform Act," *N.J.S.A.* 26:15–1 to–2, which, in part, expanded eligibility to parents with incomes from 133% to 200% of the federal poverty level, and mandated that all children in the state have health care coverage either through private or public programs. *N.J.S.A.* 26:15–1(g). The Legislature did not amend the broad definition of a "qualified applicant" contained in the FHCCA.

On June 29, 2009, the Legislature approved the annual Appropriations Act for fiscal year 2010 (FY 2010 Act), which authorized the Commissioner to promulgate regulations to "change or adjust the . . . non-financial eligibility requirements for some or all of the

applicants or beneficiaries in the program," and to "suspend in whole or in part the processing of applications for any or all categories of individuals covered by the program." *L.* 2009, *c.* 68. The Commissioner was also authorized to modify the program, based upon a plan approved by the Director of the Division of Budget and Accounting, to ensure that program expenditures would not exceed the amount appropriated. *Ibid.* On February 12, 2010, Governor Christie signed an Executive Order freezing the level of State spending.

On March 2, 2010, John R. Guhl, Director of the Division, issued Medicaid Communication No. 10–01, which provided:

> The State of New Jersey is facing unprecedented financial crisis. The budget appropriation language [FY 2010 Act] grants authority to the Commissioner of the Department of Human Services to modify enrollment levels in the NJ FamilyCare program as deemed necessary to ensure that monies expended for that program do not exceed the amount appropriated. Therefore, the following changes will be made to the NJ FamilyCare program:
>
> ● Effective March 31, 2010 coverage for non-pregnant Restricted Alien adults, who would have been lawfully admitted for permanent resident [sic] but *not* in this country five years with that status, will cease.... This change will not affect individuals enrolled in programs for pregnant women and children.
>
> ● New applications received on or after March 1, 2010 for NJ FamilyCare will *no longer* be processed for enrollment for higher income parents.... [3]

*N.J.A.C.* 10:78–3.2(e) was adopted by DHS on May 28, 2010, and provides:

> (e) On and after April 1, 2010, applicants or beneficiaries who are adult restricted aliens shall be ineligible for enrollment in, or benefits from, the NJ FamilyCare Program and any other program under this chapter, except as allowed pursuant to (e)2 below; this termination of enrollment and benefits under the program does not apply to individuals who are pregnant women or children under the age of 19.
>
> 1. The term "restricted alien," within this chapter, means an alien lawfully admitted for permanent residence, who has lived in the United States for less than five full years after such lawful admittance.
>
> 2. Enrolled restricted aliens who, between October 1, 2009 and March 25, 2010, received a medical service that was actually covered by NJ FamilyCare shall be

---

[3] In Medicaid Communication No. 10–04 (July 2, 2010), DHS advised that it had reinstated and extended coverage until June 30, 2010, for a group of non-pregnant restricted alien adults, and effective July 1, 2010, a small group of these adults would be allowed to continue coverage to June 30, 2011.

ineligible for enrollment in, or benefits from, the NJ FamilyCare Program and any other program under this chapter, effective July 1, 2010, rather than April 1, 2010. Additionally, as of July 1, 2010, the Division of Medical Assistance and Health Services may ... extend medical service coverage to any such restricted alien still enrolled who is being treated for a life threatening illness or receiving on-going life sustaining treatment; however, any such decisions regarding extending coverage, the duration of any such coverage, the extent of services covered and the reimbursement methodology used for service coverage shall all be vested in the on-going sole discretion of the Division, based upon the Division's assessment of the necessity of such coverage, use of resources and/or available options.

And, *N.J.A.C.* 10:78–1.1, adopted at the same time, provides:

For all applications received after February 28, 2010, all programs ... are closed to any enrollments of, or benefits for, parents and caretakers whose benefits are not funded or payable under Title XIX.... Therefore, such applications ... will not be processed for enrollment. Additionally, on and after April 1, 2010, applicants or beneficiaries who are adult restricted aliens, as defined at *N.J.A.C.* 10:78–3.2, are ineligible for enrollment in, or benefits from, the NJ FamilyCare Program and any other program under this chapter, except as allowed pursuant to *N.J.A.C.* 10:78–3.2(e)2; this termination of enrollments and benefits does not apply to individuals who are pregnant women or children....

On July 6, 2010, the Commissioner published the "Special Adoption" of these regulations in which she explained:

In accordance with State Fiscal Year 2010 Appropriation Act (Act), these amendments are effective upon filing with the Office of Administrative Law (OAL).... However, the Act also separately allows the Department to modify enrollment levels and any other program features or operations for the reasons described below based upon a plan approved by the Director of the Division of Budget and Accounting. The Department has such approval. Therefore, this notice of specially adopted amendments serves as public notice of program modifications that are already legally effective, as well as amends existing administrative rules, which contain text that is inconsistent with the program modifications.

[42 *N.J.R.* 1404(a) (July 6, 2010).]

In describing the social impact of the regulations, the Commissioner commented:

Approximately 887,000 individuals are enrolled in NJ FamilyCare. The Department estimates that, effective April 1, 2010, approximately 4,000 restricted alien adults will be terminated from the program as a result of the amendments. The Department also estimates that, effective July 1, 2010, a significant portion of the roughly 8,000 restricted alien adults remaining will also be terminated from the program as a result of these amendments. The Department additionally estimates that, as a result of the amendments, approximately 6,175 unenrolled adults who are parents or caretakers will be denied enrollment between April 1 and June 30 of this year, with approximately 39,369 such adults being denied enrollment throughout State Fiscal Year 2011.

The Department recognizes that there will likely be a negative social impact upon those individuals whose new enrollment is prevented or whose existing enrollment is terminated, in that medical services that would have been covered under NJ FamilyCare may be more difficult to access for those individuals. However, some of those services will still be accessible through Charity Care or community health centers. The degree to which the amendments impact those individuals will depend on the specific medical needs of, and future alternative insurance and health care options that become available....

Since the amendments will likely cause some individuals who have been denied or terminated from enrollment to rely on Charity Care and on other providers, this will likely have a negative impact on those alternative providers, if such services provided by them are extended beyond their ability to effectively address new patient needs.

[*Id.* at 1405.]

The Commissioner also described the following economic impact of the regulations:

The State will experience a positive economic impact as a result of the program revisions. It is estimated that the State will save approximately $2.5 million through the remainder of State Fiscal Year 2010 as a result of the disenrollment of approximately 4,000 restricted alien adults, as well as an additional $10 million in State Fiscal Year 2011. The additional savings to be realized from the disenrollment of remaining eligibles on July 1, 2010 won't be known until after the medical necessity reviews are complete. If all of the remaining population was disenrolled, savings realized may be upwards of an additional $20 million in State Fiscal Year 2011. It is further estimated that the State will save approximately $733,000 through the remainder of State Fiscal Year 2010 as a result of the non-enrollment of approximately 6,175 parents and caretakers, and save $24.6 million in State Fiscal Year 2011 as a result of the non-enrollment of approximately 39,369 parents and caretakers.

The Department believes that the above described costs to current and future beneficiaries and providers are necessarily outweighed by the benefits to the State, its residents and other NJ FamilyCare beneficiaries because of the contribution that the resulting savings will have on: the Department's ability to continue to ensure that amounts expended for NJ FamilyCare do not exceed amounts appropriated; the Department's ability to best serve the needs of the majority of those persons who are currently enrolled in NJ FamilyCare and the children who will be enrolled in the future; and the State's ability to ensure that it meets its constitutionally mandated responsibility to maintain a balanced budget now and in the future.

[*Ibid.*]

On June 29, 2010, the Legislature approved the annual Appropriations Act for fiscal year 2011 (FY 2011 Act), which contained provisions identical to the FY 2010 Act regarding the Commission-

er's authority to promulgate regulations and modify FamilyCare. *L*. 2010, *c*. 35.

In a memorandum dated July 21, 2010, to Charlene Holzbaur, Director of the Office of Management and Budget, regarding the "Final Approved Plan for Restricting Immigrant Adults," the Commissioner explained that the "SFY 2010 budget language" gave her the authority, based upon approval by the Director, to modify FamilyCare enrollment levels so that the program did not exceed the amount budgeted. Effective March 31, 2010, DHS had intended to terminate 12,000 adult restricted aliens from coverage. DHS learned, however, that many of these individuals were being treated for a life-threatening illness or were receiving on-going life-sustaining treatment. Thus, it identified 8000 individuals who had received a service under the program in the last six months, and extended coverage to them until June 30, 2010, as reflected in a special amendment, *N.J.A.C.* 10:78–3.2(e)(2). In cooperation with participating HMOs, DHS determined that less than 2000 adult restricted aliens required ongoing coverage, and thus it extended coverage to them until July 1, 2011, but terminated coverage for the approximately 6000 remaining adults.

## II.

We assume for purposes of deciding this motion that plaintiffs are members of a class of similarly-situated lawful immigrant residents of New Jersey who have suffered, or will suffer, adverse consequences because of the changes to FamilyCare adopted by defendants. We also assume, and defendants do not contest, that for purposes of considering whether the *Crowe* standards for preliminary injunctive relief are met, plaintiffs have, or will, suffer imminent and irreparable harm as a result.

We focus our consideration on two other factors which plaintiffs must establish by clear and convincing evidence in order to obtain preliminary injunctive relief, i.e., whether "the legal right underlying [their] claim is" settled, and whether they have demonstrated

"a reasonable probability of ultimate success on the merits." *Crowe, supra,* 90 *N.J.* at 133, 447 *A.*2d 173.

### (A)

We address plaintiffs' non-constitutional argument first. They contend: 1) that Medicaid Communication 10–01 and *N.J.A.C.* 10:78–3.2(e) are contrary to the plain language of *N.J.S.A.* 30:4J–11, which imposes no residency time bar upon eligibility for FamilyCare; 2) that the subsequently-enacted appropriation legislation cannot be interpreted as lawfully delegating to DHS the authority to modify statutory eligibility criteria; and 3) that even if the delegation were proper, DHS "did not comply with conditions of the delegation."

"That the Legislature may delegate to an administrative agency the authority to promulgate rules and regulations interpreting and implementing a statute is beyond peradventure." *T.H. v. Div. of Dev. Disabilities,* 189 *N.J.* 478, 490, 916 *A.*2d 1025 (2007). "An agency's delegated authority is particularly broad where the agency is concerned with public health and welfare." *P.P. v. N.J. Dep't of Human Servs.,* 280 *N.J.Super.* 1, 7, 654 *A.*2d 471 (App.Div.1994), *certif. denied,* 142 *N.J.* 452, 663 *A.*2d 1359 (1995). Agency regulations adopted pursuant to a legislative grant of authority enjoy presumptions of validity and reasonableness, *T.H., supra,* 189 *N.J.* at 490, 916 *A.*2d 1025, such that a challenger must "show either that the regulation is inconsistent with its enabling statute or is plainly arbitrary." *In re N.J. Individual Health Coverage Program's Readoption of N.J.A.C. 11:20–1,* 179 *N.J.* 570, 579, 847 *A.*2d 552 (2004).

A regulation will be invalidated if it is " 'inconsistent with the statute it purports to interpret[.]' " *N.J. Soc'y for the Prev. of Cruelty to Animals v. N.J. Dep't of Agric.,* 196 *N.J.* 366, 385, 955 *A.*2d 886 (2008) (quoting *Smith v. Dir., Div. of Taxation,* 108 *N.J.* 19, 26, 527 *A.*2d 843 (1987)). An agency cannot " 'under the guise of interpretation ... give the statute any greater effect than its

language allows.'" *Id.* at 385–86, 955 *A.*2d 886 (alteration in original) (quoting *Kingsley v. Hawthorne Fabrics, Inc.,* 41 *N.J.* 521, 528, 197 *A.*2d 673 (1964)).

Reviewing courts accord substantial deference to the interpretation an agency gives to a statute that it is charged with enforcing. *N.J. State League of Municipalities v. Dep't of Cmty. Affairs,* 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999). We generally will not reverse an agency's action in promulgating a regulation, unless the regulation "violates the enabling act's express or implied legislative policies." *In re Rulemaking, N.J.A.C. 10:82–1.2 & 10:85–4.1,* 117 *N.J.* 311, 325, 566 *A.*2d 1154 (1989). "Thus, the meaning of enabling legislation is pivotal to any analysis of the legitimacy of a rule." *T.H., supra,* 189 *N.J.* at 491, 916 *A.*2d 1025.

Here, *N.J.S.A.* 30:4J–11 broadly defines a qualified applicant for FamilyCare as a resident of the state who "has been lawfully admitted for permanent residence into and remains lawfully present in the United States[.]" *See also N.J.A.C.* 10:78–3.2(b) (providing that an otherwise-eligible, lawfully-admitted resident alien is entitled to FamilyCare benefits regardless of the date of entry into the United States). However, *N.J.A.C.* 10:78–3.2(e)(1) defined a new class of ineligible individuals, "'restricted aliens,'" as "an[y] alien lawfully admitted for permanent residence, who has lived in the United States for less than five full years after such lawful admittance." The regulation at issue, therefore, added an eligibility standard that was not included in the enabling act. *See T.H., supra,* 189 *N.J.* at 495, 916 *A.*2d 1025. In this regard, our decision in *A.B., supra,* 407 *N.J.Super.* at 346–47, 971 *A.*2d 403, is distinguishable because there we simply upheld a Medicaid regulation which tracked the statute's eligibility requirements by imposing a five-year time bar. Furthermore, excluding "restricted aliens" from coverage would be inconsistent with at least one purpose of the FHCCA, which was intended to reduce dependence on other State-subsidized programs, including hospital charity care. *N.J.S.A.* 30:4J–9.

Yet, as defendants argue, some reduction in enrollment in the program during lean budget years is consistent with the Legislature's stated purpose of providing subsidized health insurance coverage only "insofar as practicable . . . within the limits of funds appropriated or otherwise made available for the program." *N.J.S.A.* 30:4D–2. In short, the statute specifically reflects an inherent tension that inures to most socially-advantageous legislation, i.e., providing benefits to those unable to do so for themselves, but only to the extent permitted by current financial resources.

Moreover, as defendants further contend, consistent with this stated purpose, the Legislature, in its FY 2010 Act and FY 2011 Act, specifically delegated to the Commissioner the authority "[to] adopt immediately upon filing with the [OAL] . . . such regulations as the commissioner deems necessary to ensure that monies expended for . . . FamilyCare . . . do not exceed the amount hereinabove appropriated." *L.* 2009, *c.* 68. The Legislature further empowered the Commissioner to adopt regulations that "may change or adjust the financial *and non-financial eligibility requirements for some or all of the applicants or beneficiaries in the program,* the benefits provided, cost-sharing amounts, *or may suspend in whole or in part the processing of applications for any or all categories of individuals covered by the program." Ibid.* (emphasis added).

Specific provisions in an appropriations act may be an expression of legislative intent. *In re Boyan,* 127 *N.J.* 266, 268, 604 *A.*2d 98 (1992). As the Court explained in *Camden v. Byrne,* 82 *N.J.* 133, 154, 411 *A.*2d 462 (1980):

> [A] definite legislative intent as reflected in the general appropriation laws necessarily supersedes any previously expressed legislative desires at least for the duration of the particular appropriation act. The earlier statutes cannot coexist with the enacted appropriation and, consequently, must be deemed to be suspended by adoption of the later appropriation acts.

*See also Mid–Atl. Solar Energy v. Christie,* 418 *N.J.Super.* 499, 505, 14 *A.*3d 760 (App.Div.2011) ("Our courts have long recognized that the Legislature has the authority to change or suspend the

operation of its prior enactments through an Appropriations Act.").

In the exercise of its power to appropriate funds, the Legislature may attach " 'conditions, restrictions, or limitations on the expenditure, use, or application of appropriated funds.' " *In re Deborah Heart & Lung Ctr.,* 417 *N.J.Super.* 25, 31, 8 *A.*3d 250 (App.Div.2010) (quoting *Karcher v. Kean,* 97 *N.J.* 483, 491–92, 479 *A.*2d 403 (1984)). However, that ability is subject to the doctrine of separation of powers, *Commc'n Workers of Am. v. Florio,* 130 *N.J.* 439, 456, 617 *A.*2d 223 (1992), and constitutional limits, something we discuss below. *In re Deborah Heart & Lung Ctr., supra,* 417 *N.J.Super.* at 31, 8 *A.*3d 250.

Plaintiffs first argue that interpreting the appropriations acts as providing authority for defendants' actions results in an unconstitutional delegation of power by the Legislature to the Executive branch in violation of Article III, paragraph 1 of the New Jersey Constitution. We disagree.

"Separation-of-powers questions can arise when a branch delegates some of its own power away[.]" *Commc'n Workers, supra,* 130 *N.J.* at 456, 617 *A.*2d 223. Nonetheless, "[i]t is well-established that within limits the legislature may delegate its authority to a governmental agency." *Mt. Laurel v. Dep't of Pub. Advocate,* 83 *N.J.* 522, 532, 416 *A.*2d 886 (1980). "As long as the discretion of administrative officers is 'hemmed in by standards sufficiently definitive to guide its exercise,' the delegation of legislative powers is not unconstitutional." *Ibid.* (quoting *Cammarata v. Essex Cnty. Park Comm'n,* 26 *N.J.* 404, 410, 140 *A.*2d 397 (1958)).

These standards may be rather general. *Ibid.* The requirement that standards accompany a delegation of power serves three purposes: 1) "prevent[ing] the Legislature from abdicating its political responsibility and ... undemocratic, bureaucratic institutions from wielding all-encompassing, uncontrollable government power"; 2) "defin[ing] the area in which the agency develops

the experience and expertise that the legislature has neither the time nor resources to develop"; and 3) "facilitat[ing] judicial review ... [to] guard against arbitrary and capricious governmental action." *Ibid.* If the standards achieve these purposes, they will "be considered sufficiently definite to pass constitutional muster." *Id.* at 533, 416 *A.*2d 886.

In this case, the standards provided by the Legislature were "sufficiently definitive" to adequately guide the Commissioner's exercise of the delegated power. *Id.* at 532, 416 *A.*2d 886. The Legislature permitted the Commissioner to "change or adjust the ... non-financial eligibility requirements for some or all of the applicants or beneficiaries in the program," and "[to] suspend in whole or in part the processing of applications for any or all categories of individuals covered by the program." *L.* 2009, *c.* 68; *L.* 2010, *c.* 35.

Moreover, our courts have recognized that "a rigid and inflexible classification of powers would 'render government unworkable.'" *In re Advisory Comm. on Prof'l Ethics Op. 705*, 192 *N.J.* 46, 55, 926 *A.*2d 839 (2007) (quoting *Massett Bldg. Co. v. Bennett*, 4 *N.J.* 53, 57, 71 *A.*2d 327 (1950)). Therefore, "the doctrine requires not an absolute division of power but a cooperative accommodation among the three branches of government." *Commc'n Workers, supra*, 130 *N.J.* at 449, 617 *A.*2d 223. The doctrine was not intended "to create three 'watertight' governmental compartments, stifling cooperative action" among the branches. *In re P.L.2001, Chapter 362*, 186 *N.J.* 368, 379, 895 *A.*2d 1128 (2006).

Here, cooperation between the legislative branch, in appropriating funds, and the Commissioner, in utilizing her expertise to allocate scarce funds, was necessary to further the underlying purposes of the FHCCA. In the appropriations legislation, the Commissioner was provided with expansive authority to change the non-financial eligibility requirements and to terminate participation in the program. We note that under the predecessor FamilyCare program, the Commissioner had promulgated similar

regulations providing that effective June 15, 2002, "no applications will be accepted from aliens subject to the Medicaid five-year bar." 34 *N.J.R.* 2338(a) (July 1, 2002). The Legislature was well aware of this action and, in fact, referred to it in enacting the FHCCA. *N.J.S.A.* 30:4J–9(d). The appropriation enactments presumably reflect the legislative determination that eligibility for FamilyCare was intended to be somewhat fluid, with enrollment levels increasing or decreasing in direct proportion to the level of funding.

We conclude that the Legislature authorized suspension of benefits to certain resident aliens and denial of enrollment in FamilyCare to others, and its delegation of authority to the Commissioner to implement those restrictions within the confines of the yearly budget does not violate the separation of powers doctrine.

Plaintiffs alternatively argue that the Commissioner failed to comply with the procedural prerequisites contained in the FY 2010 Act before terminating benefits and closing off enrollment. We view that argument to be of insufficient merit to warrant discussion. *R.* 2:11–3(e)(1)(E).

Having so concluded, we express some concern over the long-term implications of defendants' position regarding the delegation of powers to the Commissioner. The FY 2010 Act and the FY 2011 Act by their express terms only granted the Commissioner the authority to adopt programmatic changes to conform to annual appropriations. *Camden, supra,* 82 *N.J.* at 154, 411 *A.*2d 462. However, *N.J.A.C.* 10:78–3.2(e) provides that restricted aliens are "ineligible" for enrollment in the FamilyCare program "now *and in the future.*" 42 *N.J.R. supra,* at 1405 (emphasis added). Because, for purposes of deciding whether to grant emergent injunctive relief, we are only concerned with whether plaintiffs have demonstrated by clear and convincing evidence that the law is clearly settled in their favor such that they have a probability of success on the ultimate merits, we do not address whether such a significant, permanent change in eligibility requirements may be

permanently effectuated by regulation without statutory amendment.

### (B)

We turn to plaintiffs' constitutional arguments that the program modifications violate the equal protection guarantees of the Federal and State Constitutions. In this regard, because the classification was based on alienage, plaintiffs contend that we must apply a strict scrutiny analysis which defendants cannot satisfy. Defendants counter that a rational basis test applies, and in any event, regardless of which standard is used, there is no equal protection violation.

### (i)

The term "'person,'" as used in the Fourteenth Amendment to the United States Constitution includes "lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson,* 403 *U.S.* 365, 371, 91 *S.Ct.* 1848, 1851, 29 *L.Ed.*2d 534, 541 (1971). "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." *Id.* at 372, 91 *S.Ct.* at 1852, 29 *L.Ed.*2d at 541–42 (footnotes omitted) (quoting *U.S. v. Carolene Prods. Co.,* 304 *U.S.* 144, 152–53 n. 4, 58 *S.Ct.* 778, 784 n. 4, 82 *L.Ed.* 1234, 1242 n. 4 (1938)). To survive strict scrutiny analysis, the State must demonstrate that the law is the least restrictive means to further a compelling state interest. *Id.* at 376, 91 *S.Ct.* at 1854, 29 *L.Ed.*2d at 544. *See Plyler v. Doe,* 457 *U.S.* 202, 217, 102 *S.Ct.* 2382, 2395, 72 *L.Ed.*2d 786, 799 (1982).

Even though lawful immigrants comprise a suspect class otherwise triggering strict scrutiny analysis, the Supreme Court applies a dichotomized standard of review. Because of the federal

government's plenary power to regulate immigration, classifications based on alienage in federal programs are subject to rational basis review. *Mathews v. Diaz*, 426 *U.S.* 67, 85–87, 96 *S.Ct.* 1883, 1894–95, 48 *L.Ed.*2d 478, 493–94 (1976). Because the states lack plenary power over immigration policy, similar classifications in a State's benefits programs are subject to strict scrutiny. *Graham, supra*, 403 *U.S.* at 376, 91 *S.Ct.* at 1854, 29 *L.Ed.*2d at 544.

Therefore, despite the federal government's broad power over immigration and naturalization, *"Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." Graham, supra*, 403 *U.S.* at 382, 91 *S.Ct.* at 1857, 29 *L.Ed.*2d at 548 (emphasis added); *See also Sanchez v. Dep't of Human Servs.*, 314 *N.J.Super.* 11, 25, 713 *A.*2d 1056 (App.Div.1998) (concluding New Jersey law adopting another section of PRWORA that permitted States to limit welfare benefits for those individuals who had not resided in New Jersey for at least twelve months was unconstitutional, holding, "federal law cannot save an unconstitutional New Jersey statute"). However, "if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction." *Plyler, supra*, 457 *U.S.* at 219 n. 19, 102 *S.Ct.* at 2396 n. 19, 72 *L.Ed.*2d at 800–01 n. 19 (citing *De Canas v. Bica*, 424 *U.S.* 351, 96 *S.Ct.* 933, 47 *L.Ed.*2d 43 (1976)).

Determining whether or not PRWORA provides a "uniform rule" is an elusive, and ultimately unsatisfying, exercise. The statute specifically permits the States to adopt its restrictions on federal benefits, e.g., the five-year bar, and apply them to state-funded benefits. It further provides that any State adopting the federal restrictions "shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy," 8 *U.S.C.A.* § 1601(7), i.e., the standard that satisfies strict scrutiny review.

Yet, PRWORA undoubtedly permits states to provide benefits to alien sub-groups otherwise ineligible for federal benefits.

This has resulted in significantly mixed decisional law. Some courts have held that PRWORA does not create a uniform rule and therefore strict scrutiny analysis is required. *See, e.g., Aliessa v. Novello,* 96 *N.Y.*2d 418, 730 *N.Y.S.*2d 1, 754 *N.E.*2d 1085–1098 (2001) (finding that the state's denial of Medicaid benefits through adoption of the five-year ban was not enacted pursuant to a uniform federal rule and could not survive, strict judicial scrutiny); *Ehrlich v. Perez,* 394 *Md.* 691, 908 *A.*2d 1220, 1224–42 (2006) (adopting the *Aliessa* court's reasoning, applying strict scrutiny review, and concluding that appropriations legislation that eliminated funding for benefits to certain resident aliens who immigrated after August 22, 1996, violated equal protection); *Finch v. Commonwealth Health Ins. Connector Auth.,* 459 *Mass.* 655, 946 *N.E.*2d 1262, 1277 (2011) (applying strict scrutiny analysis "[w]here the State is left with a range of options including discriminatory and nondiscriminatory policies" under PRWORA).

Conversely, in *Soskin v. Reinertson,* 353 *F.*3d 1242, 1244 (10th Cir.2004), the court applied a rational basis standard in reviewing equal protection challenges to a Colorado law that repealed jointly funded Medicaid coverage to otherwise legal aliens. The *Soskin* court determined that that case fell somewhere between *Graham* and *Mathews,* because unlike the state statute at issue in *Graham,* PRWORA provided specific Congressional authorization for the state's action, and unlike *Mathews,* it involved a state-administered program. *Id.* at 1255. The court noted:

Some benefits for aliens are required, some are prohibited. In between, the states are permitted to be more restrictive (or, depending on one's point of view, more generous). Relying on *Graham,* one could say, as Plaintiffs do, that when a state elects not to provide aliens with the maximum benefits permitted by federal law, it is discriminating against aliens and the federal government's imprimatur for such discrimination cannot reduce the level of scrutiny to which the state's choice is subjected under the Equal Protection Clause. This is the view adopted by the New York Court of Appeals in *Aliessa.*

We do not share that view. The reason for applying rational-basis review to federal law regarding aliens is that such laws reflect national policy that Congress

has the constitutional power to enact. Once Congress has expressed that policy, the courts must be deferential. What Plaintiffs fail to consider is that a state's exercise of discretion can also effectuate national policy. Recall that the PRWORA does not give the states unfettered discretion. Some coverage must be provided to aliens; some coverage is forbidden. State discretion is limited to the remaining optional range of coverage. In exercising that discretion each state is to make its own assessment of whether it can bear the burden of providing any optional coverage. When a state determines that the burden is too high and decides against optional coverage, it is addressing the Congressional concern (not just a parochial state concern) that "individual aliens not burden the public benefits system." 8 *U.S.C.A.* § 1601(4). This may be bad policy, but it is Congressional policy; and we review it only to determine whether it is rational.
[*Ibid.* (additional citations omitted).]

In *Avila v. Biedess,* 206 *Ariz.* 311, 78 *P.*3d 280, 282 (2003), *review denied and ordered not published,* 207 *Ariz.* 257, 85 *P.*3d 474 (2004), *cert. denied sub nom., Kurti v. Biedess,* 542 *U.S.* 942, 124 *S.Ct.* 2920, 159 *L.Ed.*2d 821 (2004), the court held that Arizona's Title XIX federally-funded Medicaid program, and its state-funded Premium Sharing Program, did not violate the equal protection clause by denying benefits to aliens who had not been legal residents of the country for five years. The court rejected the plaintiff's argument that even though the state was required to impose certain federal eligibility criteria on its Title XIX program, extension of those same criteria to the state-funded portion of the program was invalid. *Id.* at 288. The court explained:

[W]e believe it would be an impractical and strained application of the Equal Protection Clause to bar a state from using federal eligibility criteria for a state program when a mandatory federal policy applies to one portion of a program and the state merely acts to implement uniform rules of alien eligibility for another part of the same program. We believe it furthers an important governmental interest for the state to have uniform eligibility criteria for both parts of the program, so that the significant difference between the two programs is income level. When combined with the mandatory criteria imposed by federal law on the Title XIX program, we believe uniform eligibility criteria for different portions of a state program constitutes a compelling governmental interest.
[*Ibid.* (footnote omitted).]

The state law "correspond[ed] to an expressed congressional policy regarding immigration and operates in sync with the overall federal approach to immigration." *Ibid.* Thus, the court held that:

Congress has established a uniform federal policy for certain federally-funded benefits. Arizona has extended these benefits at its own expense to persons whose

income levels are too high to meet federal financial eligibility criteria, but who still need assistance. The combination of the federal policy and the benefits of uniform eligibility criteria for different parts of the state's program create the rare circumstance when a state classification based on alien status satisfies strict scrutiny.

[*Ibid.*]

Given the Federal goals explicitly stated in PRWORA, and the complicated nature of the funding for the FamilyCare program that implicates Federal and State resources, we find the court's reasoning in *Soskin supra*, 353 *F*.3d at 1255, that the appropriate standard of review lies somewhere between *Graham* and *Mathews*, to be compelling. FamilyCare is a state program created to provide subsidized health insurance coverage to low-income children, their parents, and other adults whose family incomes are too high for them to be eligible for traditional Medicaid. The program is jointly funded by the state and federal government. NJ FamilyCare, http://www.njfamilycare.org/ (last visited June 23, 2011). Lawful permanent residents, otherwise eligible for Medicaid but for the five-year bar, were eligible for coverage under FamilyCare, but only with the use of state funds. *N.J.A.C.* 10:78–1.1. Within the complex funding structure, defendants have now chosen to impose an eligibility requirement for state-funded benefits which directly conforms to federal requirements, 8 *U.S.C.A.* § 1613(a), and has been upheld by the federal courts. *See, e.g., Mathews, supra*, 426 *U.S.* at 69, 96 *S.Ct.* at 1886, 48 *L.Ed.*2d at 484. We have upheld the five-year bar in other jointly-funded, state-administered Medicaid programs. *A.B., supra*, 407 *N.J.Super.* at 349–50, 971 *A.*2d 403.

The adoption of the federal five-year eligibility bar in the state program, while not mandated, mirrors federal objectives, corresponds to an identifiable congressional policy, and "operate[s] harmoniously" within the federal program. *Plyler, supra*, 457 *U.S.* at 226, 102 *S.Ct.* at 2399, 72 *L.Ed.*2d at 805; *See Sudomir v. McMahon*, 767 *F.*2d 1456, 1466 (9th Cir.1985) ("It would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution

impels the states to refrain from adhering to the federal guidelines.").

We conclude, therefore, that plaintiffs are not likely to succeed on their equal protection claims under the United States Constitution. We reach a similar conclusion regarding plaintiff's state constitutional claims.

 Although our constitution lacks explicit equal protection language, the concept is implicit in Article I, paragraph 1, which provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." *N.J. Const.* art. I, ¶ 1. *See also McKenney v. Byrne*, 82 *N.J.* 304, 316, 412 *A.*2d 1041 (1980). The expansive language of this constitutional provision is the source for the equal protection guarantee. *Sojourner A. v. N.J. Dep't of Human Servs.*, 177 *N.J.* 318, 332, 828 *A.*2d 306 (2003).

 In analyzing equal protection challenges under the state constitution, our courts have rejected the federal multi-tiered analysis (strict scrutiny, intermediate scrutiny, rational basis), and employ a more flexible balancing test that considers three factors: "(1) the nature of the right asserted; (2) the extent to which the statute intrudes upon that right; and (3) the public need for the intrusion." *State v. O'Hagen*, 189 *N.J.* 140, 164, 914 *A.*2d 267 (2007). Although the federal and state tests are different, they "weigh the same factors and often produce the same result." *Sojourner, supra,* 177 *N.J.* at 333, 828 *A.*2d 306.

 Here, the means selected by defendants—adopting the federal eligibility criteria for aliens—bears a real and substantial relationship to PRWORA's "compelling governmental interest of assuring that aliens be self reliant in accordance with national immigration policy," and New Jersey's interest in providing subsidized health insurance within the limits of the appropriations as set forth in the enabling act. *N.J.S.A.* 30:4J–16. We conclude

that under the more flexible standard of review applied to plaintiffs' state constitutional claims, they are unlikely to succeed on the merits of their complaint.

Accordingly, plaintiffs' motion for preliminary injunctive relief is denied.